**VERMONT INTERNATIONAL PETRO-LEUM CO., INC., Plaintiff,**

v.

**AMERADA HESS CORPORATION, Defendant.**

**PETROL OIL CORPORATION, Plaintiff,**

v.

**AMERADA HESS CORPORATION, Defendant.**

Nos. 75–CV–128, 75–CV–327.

United States District Court, N. D. New York.

July 1, 1980.

Milbank, Tweed, Hadley & McCloy, New York City by Adlai S. Hardin, Jr. and Charles W. Westland, New York City, for defendant.

Frank, Bernstein, Conaway & Goldman, Baltimore, Md. by Robert G. Levy, Berryl A. Speert, Allan P. Hillman and Jacob Silverman, Baltimore, Md., for plaintiffs; De-Graff, Foy, Conway & Holt-Harris, Albany,

N. Y. by Michael J. Cunningham, Albany, N. Y., of counsel.

## OPINION

MacMAHON, District Judge.*

These actions by two independent gasoline retailers involve price-fixing claims against defendant Amerada Hess Corporation ("Hess"), an independent gasoline marketer, for the period June 1971 through September 1973, in the area of Albany, New York. Each of the plaintiffs, Vermont International Petroleum Co., Inc. ("VIP") and Petrol Oil Corporation ("Petrol"), operated several gasoline service stations in the Albany area from 1971 or earlier until mid-1973, when they went out of business.

In March and July 1975, plaintiffs brought these actions against Hess and several other independent oil companies, alleging a price-fixing conspiracy in violation of Sherman Act § 1 [1] and seeking treble damages, injunctive relief, and attorneys' fees and costs under Clayton Act §§ 4 and 16.[2] During extensive discovery and other pretrial proceedings, the claims against all defendants except Hess were settled and dismissed, the scope of the controversy was narrowed, and the claims for injunctive relief were dropped.

The cases were tried together before us, from June 26 to July 20, 1979, on the issues of both liability and damages. Plaintiffs' theory upon the trial was that:

(1) Hess conspired with other independent gasoline marketers—Kayo Oil Co. ("Kayo"), Gibbs Oil Co. ("Gibbs"), Gasland, Inc. ("Gasland"), Ashland Oil, Inc. ("Ashland") and four of its subsidiaries—and with an industry organization, the Society of Independent Gasoline Marketers of America ("SIGMA"), to stabilize retail gasoline prices in the Albany area at artificially high levels;

(2) wholesale prices charged by Hess and its coconspirators to their dealers and other purchasers were pegged to the retail prices, with the result that wholesale prices also became stabilized; and

(3) plaintiffs, as wholesale purchasers from Ashland, Gibbs, Gasland, and others, were thus overcharged and injured during the period June 1971 to September 1973 (the "conspiracy period").

After these actions were commenced, but before trial, on June 1, 1976, a grand jury in the United States District Court for the District of Maryland indicted Hess, Ashland, Kayo, other independent oil companies, and SIGMA for a violation of Sherman Act § 1, alleging a conspiracy to fix retail gasoline prices during the period 1967–1974 in the District of Columbia and six "Middle Atlantic" states—New York, New Jersey, Pennsylvania, Maryland, Delaware, and Virginia. A jury found Hess, Ashland, Kayo, and SIGMA guilty on August 30, 1977, and the judgments of conviction were affirmed on December 26, 1979.[3]

Plaintiffs do not appear to rely on the judgment of conviction against Hess as *prima facie* evidence of Hess' participation in the conspiracy alleged here.[4] In any event, we decline to give that judgment such effect because the conspiracy alleged here differs from that charged in the criminal case since it covers a smaller geographic area and time period. Thus, we cannot say with confidence that the jury found that the criminal conspiracy covered the Albany area from June 1971 to September 1973. Moreover, the conspiracy alleged here is not identical to the criminal conspiracy for it has two members—Gibbs and Gasland—who were not charged in the criminal case.

However, upon the trial, we did receive in evidence testimony given at the criminal trial because the witnesses were uncoopera-

---

* Chief Judge of the United States District Court for the Southern District of New York, sitting by designation.

1. 15 U.S.C. § 1.

2. *Id.* §§ 15, 26.

3. *United States v. Society of Independent Gasoline Marketers*, 624 F.2d 461, [1980–1] Trade Cas. (CCH) ¶ 63,097 (4th Cir. 1979).

4. *See* Clayton Act § 5(a), 15 U.S.C. § 16(a).

tive and beyond the subpoena power of the court. Plaintiffs also presented deposition testimony of some witnesses who were beyond the subpoena power. Denied the advantage of observing the demeanor of these witnesses, we were unable fully to appraise their credibility. Moreover, some of the testimony from the criminal trial was patently inadmissible. Other such testimony was entitled to little, if any, weight because of leading and vague questions and conclusory and general answers. Nonetheless, based on such evidence as we received, we now make our findings of fact and conclusions of law.

## I. *Background.*

### A. *The parties.*

Plaintiff VIP, a Vermont corporation, sold gasoline to the public at retail gasoline stations from June 1971 to June 1973, when it went out of business and into bankruptcy proceedings. While in business, VIP operated 7 stations in Vermont and 12 in New York. Seven of the New York stations were within a 100-mile radius of Albany. Five of these were located within the "Tri-City" or "Albany area," consisting of Albany, Troy, Schenectady, and their environs within a 50-mile radius of Albany.

VIP purchased almost all of its gasoline from wholesalers at the Port of Albany and shipped it to its stations through independent truckers. During most of the conspiracy period (June 1971 to September 1973), VIP purchased most of its gasoline either directly from Gibbs or from Gibbs' wholly-owned subsidiaries, Astroline Petroleum Corp. ("Astroline") and Terminal Oil Co. of Vermont ("Terminal"). However, during part of 1972, from June until late October, VIP bought most of its requirements from Ashland. In addition, VIP bought small amounts from Gasland and from other companies not alleged to be conspirators, such as Bray and Sousa. VIP brought no gasoline from Hess.

Plaintiff Petrol, a New York corporation, sold gasoline to the public at retail gasoline stations from January 1969 until September 1973, when it sold its assets to Gasland and

dissolved. Petrol operated 10 stations in the Albany area.

Petrol purchased its gasoline from wholesalers at the Port of Albany. During the period from 1971 to 1973, Petrol bought most of its gasoline from Gasland and its predecessor, successor, and affiliate corporations, Gastown and Good Hope Industries. Petrol also purchased from Ashland, Gibbs and its Astroline subsidiary, Bray, Sousa, Coastal States Marketing, Inc., Tenneco, and others. Petrol purchased no gasoline from Hess.

Defendant Hess, a Delaware corporation with its principal place of business in New York and with offices in New Jersey, is an "independent" gasoline marketer which sells gasoline to the public through retail gasoline stations under the "Hess" brand name in most states along the eastern seaboard. During the period 1968–1974, Hess sold gasoline through 103 Hess stations in New York, 16 of which were located in the Albany area.

### B. *The alleged co-conspirators of Hess.*

Gibbs, a Massachusetts corporation, was an independent marketer of gasoline during the conspiracy period. Gibbs supplied gasoline at wholesale to both VIP and Petrol through itself and its wholly-owned subsidiaries, Astroline and Terminal. In addition, Gibbs sold gasoline to the public at retail gasoline stations. It marketed "Tulsa" brand gasoline at 6 such stations in the Albany area.

Gasland, as well as its predecessor, successor, and affiliate corporations, such as Gastown and Good Hope Industries, was an independent marketer of gasoline during the conspiracy period. It supplied gasoline at wholesale to VIP and Petrol. In addition, Gasland sold gasoline to the public at 230 retail gasoline stations in the State of New York, 8 of which were located in the Albany area at some time during the conspiracy period.

Ashland, a Kentucky corporation, was an independent marketer of gasoline during the conspiracy period. It supplied VIP, Pe-

trol, and other independents at wholesale. In addition, during the conspiracy period Ashland supplied four wholly-owned subsidiaries and alleged co-conspirators—Bi-Lo Stations, Inc. ("Bi-Lo"), Hi-Fy Gasoline Stations, Inc. ("Hi-Fy"), Payless Stations, Inc. ("Payless"), and Southern Oil Co. of New York ("Southern")—which sold gasoline to the public at retail gasoline stations in the State of New York under the respective brand names "Bi-Lo," "Hi-Fy," "Payless," and "Rotary." During the conspiracy period, there were two Rotary stations and one Payless station in the Albany area.

Kayo, a Delaware corporation having its principal place of business in Tennessee, was an independent marketer of gasoline during the conspiracy period. It sold gasoline to the public under the "Kayo" brand name through 24 gasoline stations in the State of New York, at least 5 of which were located in the Albany area during the conspiracy period. Kayo did not supply VIP or Petrol.

SIGMA was an organization of the independent gasoline marketers industry. It was located in St. Louis during the conspiracy period. Its members during that period included Hess, Gibbs, Southern, Payless, and others. Kayo was a member for 1½ years. Gasland was not a member.

### C. *Interstate commerce.*

■ The gasoline involved here originated outside New York and entered the state either at the Port of Albany or at other ports and was barged to Albany. Some of this gasoline was purchased at the Port of Albany by plaintiffs and others and resold at gasoline stations in the Albany area and elsewhere in New York. Some was resold by VIP at gasoline stations in Vermont. We thus conclude that the gasoline was in interstate commerce and that the activities of all the parties had a substantial effect on interstate commerce.

### D. *The retail gasoline market in the Albany area.*

As we have stated, the Albany area consists of Albany, Troy, Schenectady, and their environs within a 50-mile radius of Albany, New York.

In the Albany area, as throughout New York, gasoline was sold to the public at retail gasoline stations of two types, those supplied by so-called "major" oil companies, such as Mobil, Texaco, and Shell, and those supplied by "independents," such as Hess and Ashland. During the conspiracy period, the majors accounted for about 78% of all gasoline sales in New York, and the independents for the remainder.

Though the testimony was less than clear and in some cases nonexistent as to who set the retail price at a given station, we conclude that two methods were in use by both the majors and the independents. The supplier directly set the retail price if the supplier owned the station and employed the operator. In such a case, the operator did not purchase gasoline from the supplier and retail it to the public. Instead, the operator simply received a supply from the supplier and sold it directly to the public at the price set by his employer. The operator was paid by the supplier on a commission basis. This pricing system was used by Gasland.

A second method was the system of suggested retail prices coupled with "voluntary allowances." Under this system, the supplier sold gasoline to an operator or dealer at a "tank wagon" or wholesale price, and then suggested to the dealer a retail price to be charged to the public. This system was used by Hess and others.

Though in theory a dealer could charge whatever price he wished under this method, in practice Hess dealers almost always charged the retail price suggested by Hess. One reason for this was that Hess had the right to cancel a dealership, thus giving Hess dealers a strong incentive to do what was suggested.

Moreover, a supplier using the suggested retail price method could affect retail price by instituting or withdrawing a "voluntary allowance," also known as a "temporary voluntary allowance," "TVA," or "allowance." A voluntary allowance was simply a reduction in the tank wagon price which

had the effect of lowering a dealer's cost of gasoline. Hess, for example, could normally effect the lowering of the retail price at a given Hess station by giving the dealer a voluntary allowance and simultaneously suggesting a lower retail price. Conversely, Hess could raise the retail price by withdrawing the allowance and suggesting a higher retail price. As a practical matter, then, a supplier using the indirect suggested retail price system had substantially as much control over its dealers' retail prices as did a supplier who set price directly.

Although at the wholesale level there was only one market for independents in the Albany area—that at the terminals at the Port of Albany—at the retail level there were several markets that were often as small as a street corner or a stretch on a highway. Thus, although a retailer often bought gasoline from one supplier at a single price at the Port of Albany, he often resold it to the public at several different prices in the Albany area. For example, at various times during the conspiracy period, one Petrol station in the Albany area was selling at 32.9 cents per gallon, while another within the area, but in a different locale, was selling at 28.9 cents.

The volume of sales at any given station was highly sensitive to its retail price relative to the prices of competing stations in the locale. Thus, a price drop at one station often resulted in an almost instantaneous surge in sales there and a concomitant drop in the sales of competing stations.

The Hess price maps show that at most locales in the Albany area, there was a mixture of independent and major stations. The independents competed against the majors, who offered a wider range of services, by pricing gasoline below them. Hess' policy, for example, as testified through deposition by its marketing coordinator, Irving Grossman, was to suggest to a dealer a retail price about 2 cents below the prices posted at competing major stations. W. J. Nodine, operator of small independent stations in the Syracuse area, testified that his policy was similar. Although Grossman's testimony did not focus on the Albany area,

the Hess price maps for that area show that Hess was generally at least 2 cents below Mobil and other majors.

Grossman, who received daily reports of prices of competitors of each Hess station in New York, also testified as to how price wars developed in areas where independents and majors were competing.

If an independent dropped its price, other independents, afraid of losing volume, would follow, with the result that the price structure of competing independent-supplied stations would become depressed and the price differential between independents and majors would grow. Then a major, usually Mobil in the State of New York, having lost some volume to the independents, would announce a voluntary allowance that would enable Mobil dealers to reduce their prices. Other majors would have to follow, and soon the entire retail price structure in the affected area would be lower, a situation that would obviously benefit consumers but would not help the oil companies since overall volume and market shares would remain about the same.

This testimony again did not specify any particular area, but we infer that such price wars were possible and undesirable to oil companies wherever there was a mixture of competing stations.

## II. *The Alleged Conspiracy to Fix Retail Prices.*

We conclude that during the period June 1971 through September 1973, Hess participated in a conspiracy to stabilize retail gasoline prices in the Albany area at artificially high levels.

### A. *Hess' lawful pricing practices.*

We have already seen how Hess could affect the retail price posted at a Hess station through the system of suggested retail prices and voluntary allowances. Hess' marketing coordinator from before the conspiracy period until March 15, 1973 was Irving Grossman, who was stationed first at Perth Amboy and then at Woodbridge, New Jersey. Grossman was ill and

absent from work, however, from July through September 1971 and from January through March 1972. Thereafter, until his retirement, he worked part time. During his absences, other Hess employees, Dombrowski and Koch, filled in for him.

Grossman's job was to determine what tank wagon prices to charge Hess dealers throughout the Middle Atlantic states, what retail prices to suggest, and when to give or withdraw voluntary allowances. His pricing decisions were based in part on public information lawfully obtained. An extensive network of Hess sales supervisors and district managers reported to him daily the price and volume of every Hess station, as well as the prices posted at competing stations. In addition, Grossman read The New York Times and the Journal of Commerce, which periodically reported gasoline market conditions. Finally, he perused Platt's Oilgram, a daily publication that contained broad surveys and announced wholesale price changes by the majors.

### B. Evidence of conspiracy.

In addition, however, Grossman and other Hess employees engaged in a consistent pattern of communications with competitors, both directly and indirectly through SIGMA, regarding stations in the Albany area and elsewhere, before and during the conspiracy period, which viewed as a whole can only lead to a conclusion of conspiracy to stabilize retail prices covering the Albany area from June 1971 to September 1973. During this period, SIGMA, through its employees, Richard Reynolds, Howard Teak, and Robert Cavin, served as a clearinghouse for the exchange of retail price information among independent gasoline marketers. The information was conveyed through telephone calls between SIGMA employees and those of the independents concerning posted retail prices, as well as planned price changes. In essence, SIGMA was the agent of the participating independents.

### 1. Interseller price verification.

The purpose of some of the communications was merely to verify what prices were currently being charged at a given station or in a given area, or what prices were being charged to a dealer.

For example, Grossman testified at the criminal trial that he often talked by telephone with Ralph Spurrier, who was manager of Ashland's Buffalo Division in charge of wholesale pricing until May 15, 1972. Grossman informed Spurrier of low retail prices being charged by an Ashland customer. Jack Stanley, principal of Gasland, testified at deposition that he often conversed by telephone with Grossman in 1972–1973 to ask whether Hess or a competitor had raised a tank wagon or a retail price. Grossman testified that these conversations covered all markets, including the Albany area. Grossman also had conversations with Steven Oppenheim of Gibbs regarding "marketing problems," but Grossman's testimony was unclear on whether these covered the Albany area.

■ Such price verification is not, of course, per se unlawful.[5] Nonetheless, since it carries the potential for price-fixing agreements, we must scrutinize it carefully.[6] As will be seen, we do not rest our conclusion solely upon exchanges of information regarding existing prices.

### 2. Queries regarding reasons for a price.

A second type of communication was to inquire why a certain price was low. For example, Grossman testified that in his conversations with Spurrier of Ashland, he often asked why a particular Ashland customer's retail price was low and stated that he saw no reason for the low price. Spurrier replied that the customer was probably trying to increase his volume. These discussions occasionally concerned upstate New York, but Grossman recalled none in particular about the Albany area. Grossman further testified, however, that after such discussions the low price often came up.

---

5. *United States v. United States Gypsum Co.,* 438 U.S. 422, 453–59, 98 S.Ct. 2864, 2881–2885, 57 L.Ed.2d 854 (1978).

6. *United States v. United States Gypsum Co., supra,* 438 U.S. at 458–59, 98 S.Ct. at 2884–85.

In 1970 or 1971, Grossman made a similar call to James Larson, then pricing manager of Kayo, regarding certain prices in New Jersey. Similarly, Grossman talked to Reynolds, Teak, and Cavin of SIGMA between 1967 and 1974. Often one of them asked him why a particular station or market was low, and often he asked one of them the same question.

These communications, though phrased in the form of inquiries, were in substance tacit requests for a competitor to raise its prices. That this is so will be seen after the whole pattern of communication is described.

### 3. *Advance notice of price changes.*

A third type of communication concerned future price changes. For example, Joseph Lamson, vice-president of marketing at Payless from 1968 until November 1973, testified at the criminal trial that during 1972 and 1973 he received calls from people at Ashland, the parent of Payless, advising him that certain competitors would be increasing their prices at certain stations in the Middle Atlantic states on a certain date. He did not specify Albany. Lamson further testified that he occasionally told Larson and Ernest Gill of Kayo what Payless planned to do in the future and that he did this because he wanted them to know of Payless' plans.

Several companies advised SIGMA in advance of their price moves. In 1971 and 1972, James Stevens, district manager of Southern for New York, occasionally called Reynolds at SIGMA to advise him of a future price move by Southern. Reynolds testified at the criminal trial that Harvey Dunbar, president and later chairman of Southern, and Larry Von Wormer, operations manager of Southern, often informed him between 1969 and 1973 of planned price moves by Southern in upstate New York. Reynolds testified that he received similar information from Spurrier of Ashland and other Ashland officials between 1970 and 1974 regarding retail price changes by Ashland subsidiaries.

Larson of Kayo was in telephone communication, from 1968 to 1972, with Teak, Reynolds, and Cavin of SIGMA. Larson often told one of them what he was going to raise a price at a certain Kayo station. Larson testified at the criminal trial that he informed SIGMA in advance of a nationwide Kayo price increase in the summer of 1971. Lamson of Payless often called SIGMA employees in the early 1970's to advise them of Payless' price intentions at various stations.

Grossman testified at the criminal trial that between 1967 and 1974, in telephone conversations with Reynolds of SIGMA, he often told Reynolds that he was going to remove a voluntary allowance to a certain dealer in the Middle Atlantic states on a certain date. Grossman added that his intention was that Reynolds would spread the information to Hess competitors so as to stabilize the market. Reynolds' testimony at the criminal trial corroborated the conversations and added that Grossman often asked him to pass the advance notice along to competitors. Reynolds also testified that he received similar calls from Dombrowski and Koch of Hess during the periods when Grossman was ill. Grossman, however, testified upon his deposition that he discussed the New York market with SIGMA very seldom and that he did not recall telling anyone at SIGMA about New York markets.

Finally, SIGMA, upon receiving advance notice of price changes, passed the information along to competitors. Reynolds, for example, testified at the criminal trial that from 1967 to 1974 he passed such information along throughout the Middle Atlantic states, including New York, to Larson of Kayo, Lamson of Payless, Dunbar of Southern, and Spurrier of Ashland. Lamson, Larson, and Stevens of Southern testified to receiving such information from SIGMA employees and raising prices in reliance on the information.

### 4. *Solicitation of cooperation.*

A fourth type of communication involved solicitation of cooperation in purported joint

price increases. Stevens of Southern testified that he called Grossman in the summer of 1971 or 1972 and asked him to raise a Hess price, but Grossman refused. Reynolds testified at the criminal trial that, throughout the 1967–1974 period, he called Grossman of Hess, Dunbar of Southern, and Larson and others of Kayo to suggest that they cooperate in a price increase in the Middle Atlantic states. Lamson of Payless testified at the criminal trial that he received similar calls from Reynolds.

### 5. *Agreements.*

Finally, there was some small testimony of actual agreements to fix prices. Larson of Kayo testified in general terms at the criminal trial that, from 1968 until September 1972, he often called SIGMA and occasionally unnamed competing companies to assent to a price increase. Some of these conversations related to the New York area. Lamson of Payless testified to the same effect.

Much of this testimony was admittedly in general terms, and some of it came from witnesses who had received immunity from prosecution. Nonetheless, we give it more than a little weight. Almost every witness, whether live or at the criminal trial or at deposition, testified to essentially the same pattern of communication, a pattern so pervasive that it is understandable that most witnesses could not recall specific conversations regarding specific markets during a two-year period several years ago. Moreover, the testimony was corroborated not only by other participants, but by independent witnesses and by documentary evidence.

### 6. *Other evidence.*

Finally, there was evidence corroborating the existence of a conspiracy to fix retail prices in the Albany area. SIGMA's interest in soliciting cooperation among retailers in the New York area was shown by the testimony of W. J. Nodine, a small retailer in the Syracuse area, that SIGMA representatives telephoned him six or eight times in the 1969–1971 period, told him that com-

petitors were raising their prices, and asked him to do the same. Jack Stanley of Gasland testified that SIGMA called him to solicit his membership in the organization.

SIGMA's telephone invoices show that during the conspiracy period, 87 long distance telephone calls were made from SIGMA to Southern's offices in Elmira, New York, and that 193 were made to Hess' Woodbridge, New Jersey, offices. These records underrepresent the actual number of telephonic communications because they show neither calls from Southern or Hess to SIGMA, nor calls made on SIGMA's WATS line which was in operation as of 1972. The records do not, of course, show the content of the calls, but they do show a constant pattern of communication.

Hess' participation was further shown by the taped telephone calls of January 1970 between Norman Goldberg of Hess and Joseph Painter, a former Hess employee and then principal of Petrol, in which Goldberg complained of a low Petrol price near Schenectady, stated that Hess would have to bring its price down unless Petrol came up, and warned that Painter might be responsible for allowing the bottom to drop out of the Albany market. Painter testified that he received several similar telephone calls from Grossman in the years 1970–1972. Although Painter's interest as Petrol's principal is obvious and we were not favorably impressed by his demeanor and the inconsistencies between his trial and prior testimony, we cannot wholly disregard his testimony. It stands unrebutted and was corroborative of the pattern described above.

### C. *Members of the conspiracy.*

Against all this, Hess asserts that there is no evidence showing an actual unlawful communication regarding the Albany area during the conspiracy period. We agree that, outside of Painter's testimony, most of the testimony of communications either referred generally to New York or to the Middle Atlantic states as a group, or referred specifically to markets outside the Albany area, such as New Jersey. Furthermore, much of the testimony did not refer

specifically to the period alleged here but to the period 1967–1974. Finally, Hess points to instances where Grossman refused to tell a competitor what his intentions were and refused to raise a price.

Nevertheless, when viewed as a whole, as it must be,[7] the evidence shows that a constant pattern of communication covering New York and other Middle Atlantic states occurred during the conspiracy period. The nature of the telephone conversations went far beyond mere verification of already existing prices. Conversations included advance notice of price changes, solicitation of cooperation in joint moves, threats of price wars likely to coerce a weak retailer into raising his price, and some outright agreements to fix prices.

The inference is inescapable that there was a common, tacit understanding, at least among SIGMA, Hess, Ashland, Kayo, Southern, and Payless, that SIGMA would pass advance notice of one competitor's price increase along to the relevant competitors, who would then institute a similar increase. The pattern of communication was so pervasive that we must conclude that it affected the Albany market. Hess, for its part, did not call or depose any witness to rebut that inference, and we may take this silence into account in reaching our conclusion.[8]

The question remains as to who were the members of the conspiracy. Based on the evidence recited above, we are satisfied that the conspiracy included at least Hess, SIGMA, Kayo, Ashland, and Ashland's subsidiaries, Southern and Payless.

We conclude that Ashland subsidiaries, Bi-Lo and Hi-Fy, were not members of the conspiracy. Although we may infer that Ashland's status as parent gave it substantial control over their retail prices, there was very little testimony of communications with officials of those companies. Moreover, Plaintiffs' Exhibit 94, a map showing locations of independent retail gas-

oline stations in the Albany area, shows no Bi-Lo or Hi-Fy stations in that area.

We conclude further that Gasland and its affiliates were not members of the conspiracy, at least during the conspiracy period. Neither Gasland nor its affiliates or principal, Jack Stanley, was a member of SIGMA at any time. No SIGMA records or testimony show any communication between SIGMA and Gasland, other than one telephone call to solicit, unsuccessfully, Gasland's membership. Stanley denied any contact with any conspirator other than Hess, and there was no evidence that Gasland did communicate with any other conspirators. Plaintiffs offered no evidence showing that Gasland prices moved in conjunction with those of conspirators.

Though there was some contact between Gasland and Hess, it was simply not enough to tie Gasland into the conspiracy alleged here. Richard Anthony, a former Hess employee, testified that on one occasion in 1969, at Grossman's behest, he telephoned Gasland and secured its agreement to follow a Hess price increase in western Massachusetts. Anthony made no other calls, however, and the one that he did make related neither to Albany nor to the conspiracy period.

Stanley admitted talking by telephone with Grossman during the conspiracy period, but only to verify prices of competing majors and possibly independents. He also admitted asking Grossman what Hess' intentions were, but testified that Grossman refused to tell him. Grossman testified that he discussed "pricing" or "marketing" problems with Stanley on some other occasions, but did not admit to telling Stanley of Hess' intentions. Periodically, in contrast, he told SIGMA of his intentions, and, as we have seen, SIGMA passed this information along to other companies but not to Gasland.

In sum, the nonhearsay evidence shows only that during the conspiracy period, Gas-

**7.** *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962).

**8.** *Interstate Circuit Inc. v. United States*, 306 U.S. 208, 225–27, 59 S.Ct. 467, 473–475, 83 L.Ed. 610 (1939).

land communicated with Hess to verify prices and that it unsuccessfully sought Grossman's cooperation in a price increase.

There was hearsay testimony by Anthony that Grossman and Stanley colluded on prices prior to 1969, but this was uncorroborated and did not show a pattern extending into the conspiracy period.

Finally, Painter testified that Stanley called him once in 1972 and said that Grossman told Stanley to tell Painter to quit "screwing around" with prices. Stanley did not corroborate this telephone call. We have already commented on Painter's credibility. We merely add here that the single call, if it occurred, would only show that Gasland tried to frighten Petrol into raising prices, not that Gasland was knowingly acting in concert with Hess, SIGMA, Ashland, Southern, Payless, and Kayo.

We do conclude, however, that Gibbs was a member of the conspiracy. As with Gasland, Grossman testified at his deposition that he had conversations with Steven Oppenheim of Gibbs regarding "pricing problems" in the Albany area and elsewhere. Like Painter, Spain of VIP testified that he received five or ten calls from Oppenheim in 1971 and 1972 in which Oppenheim said that there was a coordinated price move and that Grossman expected VIP's cooperation. Were this all, we would be loathe to hold Gibbs a member of the conspiracy. In addition, however, Gibbs was an active member of SIGMA. We infer that Gibbs at least received notice from SIGMA of coordinated price moves, even if Gibbs had no direct contact with other conspirators.

Thus, we conclude that from June 1971 through September 1973, Hess, SIGMA, Ashland, Kayo, Southern, Payless, and Gibbs conspired to stabilize retail gasoline prices in the Albany area.

### III. The Fact of Damage.

#### A. Legal defenses.

Plaintiffs claim that the conspirators' wholesale prices were pegged to their retail prices and that, as a result of the conspiracy, the wholesale prices paid by plaintiffs were artificially high. Hess makes two arguments that the complaints should be dismissed because plaintiffs could not have suffered injury as a matter of law.

First, Hess argues that since the object of the conspiracy was to fix only retail prices, plaintiffs were not within the "target area" of the conspiracy[9] because they did not buy gasoline at retail. We disagree. The target area included both consumers and purchasers at wholesale or tank wagon prices, such as plaintiffs. Obviously, Southern and Payless, which sold directly to consumers, had only consumers as their targets. Similarly, Hess, which sold only to dealers except on rare occasions, had only the dealers as its target. Ashland, however, sold only to retailers, such as its subsidiaries, plaintiffs, and others. Thus, plaintiffs were within its target area. Finally, Gibbs sold to the public and to other retailers, such as plaintiffs, so they are included within its target area. We thus conclude that plaintiffs were within the target area of the conspiracy.[10]

The recent Supreme Court case of *Illinois Brick Co. v. Illinois*[11] does not compel a different result. In *Illinois Brick*, the Court held that an indirect purchaser could not recover treble damages from a price-fixer. Here, plaintiffs were direct purchasers from conspirators Gibbs and Ashland. The dangers of duplicative recoveries and the burdensome task of apportioning economic injuries among different purchasers in the chain of distribution, condemned in *Illinois*

9. See, e. g., Long Island Lighting Co. v. Standard Oil Co., 521 F.2d 1269 (2d Cir. 1975), cert. denied, 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 83 (1976); Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc., 454 F.2d 1292 (2d Cir. 1971), cert. denied, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972).

10. See Phillips v. Crown Cent. Petroleum Corp., 395 F.Supp. 735 (D.Md.1975), aff'd in part and rev'd in part, 602 F.2d 616 (4th Cir. 1979), cert. denied, —— U.S. ——, 100 S.Ct. 1021, 62 L.Ed.2d 756 (1980).

11. 431 U.S. 720, 97 S.Ct. 2061, 50 L.Ed.2d 707 (1977).

*Brick,* are simply absent here. Consumers injured by high prices at Hess stations would be barred under *Illinois Brick* from suing Hess for damages; their remedy would lie against Hess dealers unless they could show that the dealers were utterly controlled by Hess, a question not at issue here. Similarly, consumers claiming that Petrol and VIP prices were raised by Hess' actions would be relegated to an action against Petrol and VIP, not Hess.

Second, Hess argues that any losses resulting from overcharges paid by plaintiffs at wholesale were "inherently offset" by gains they reaped from an artificially high retail price level assertedly caused by the conspiracy.[12] This argument would apply, however, only if Hess' wholesale prices were pegged to plaintiffs' retail prices, or if plaintiffs joined the conspiracy and consistently increased their retail prices along with the other conspirators, or if the conspiracy inflated plaintiffs' retail prices to the same extent that it allegedly inflated the retail prices of Hess dealers and of stations operated by Payless, Southern, Kayo, and Gibbs.

Hess does not contend that either of the first two possibilities is true. The third possibility merely presents a defense based on an antitrust treatise which, unfortunately for Hess, is not the law. The essence of the argument is that plaintiffs cannot recover from Hess because they passed on any wholesale overcharge to the public in the form of higher retail prices. The Supreme Court, however, rejected this defense in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,*[13] on the ground, among others, that recognition of a passing-on defense would chill private enforcement of the anti-

trust laws by placing the burden of enforcement upon the ultimate consumers, whose tiny and dispersed losses would give them little incentive to sue.

A third legal question, indirectly suggested but not squarely briefed by Hess, is whether plaintiffs can recover from Hess for alleged overcharges paid to competitors of Hess who were not members of the conspiracy, such as Gasland, Sousa, Bray, and Coastal States Marketing, Inc.[14] There is a split in the circuits on this question,[15] which we need not attempt to resolve in view of our factual findings below.

### B. *Proof of injury.*

■ In order to recover damages, plaintiffs must show that the conspiracy was a material cause of injury.[16] They have failed to prove this, either by a preponderance of the evidence or to a "reasonable certainty."[17]

We note at the outset that, although these cases do not present the danger of duplicative recoveries feared by *Illinois Brick,* they do present a classic example of the insuperable problems of proof condemned in that case wherever a plaintiff attempts to trace the consequences of wrongdoing among several levels of distribution and among several different firms.

■ In order to prove that they were overcharged, plaintiffs had to supply several links in a chain of causation. They had to prove that (1) the conspiracy succeeded in raising retail prices in the Albany area; (2) wholesale prices at the Port of Albany were pegged to retail prices in the Albany area; and (3) the wholesale prices actually paid by plaintiffs were raised because of the linkage.

---

12. *See* 2 P. Areeda & D. Turner, Antitrust Law ¶¶ 334e, 335b, 347 (1978).

13. 392 U.S. 481, 483–94, 88 S.Ct. 2224, 2226–2232, 20 L.Ed.2d 1231 (1968).

14. The parties appear to agree that plaintiffs may recover any proven overcharge by Hess' co-conspirators, Ashland and Gibbs. *See, e. g., Northwestern Oil Co. v. Socony-Vacuum Oil Co.,* 138 F.2d 967, 971 (7th Cir. 1943).

15. *Compare In re Beef Ind. Antitrust Litigation,* 600 F.2d 1148, 1166 n.24 (5th Cir. 1979), *with Mid-West Paper Prods. Co. v. Continental Group, Inc.,* 596 F.2d 573, 580–87 (3d Cir. 1979).

16. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n.9, 89 S.Ct. 1562, 1571 n.9, 23 L.Ed.2d 129 (1969).

17. *E. g., Mid-West Paper Prods. Co. v. Continental Group, Inc., supra,* 596 F.2d at 584 n.43.

On the first link, plaintiffs put in no proof as to what the retail prices in the Albany area actually were during the conspiracy period. No dealer testified, for example, that he followed the prices posted at a conspirator's station. Painter testified that sometimes he followed and sometimes he did not. Plaintiffs introduced no records showing that retail prices in a given locale in the Albany area clustered at the assertedly high levels posted by the conspirators. Although Grossman and Painter testified that Hess was the "reference seller" among independents in the Albany area, i. e., the seller setting the price others used as a peg for their prices, this testimony was not corroborated by actual price data, and we discount it as self-laudatory by Grossman and self-serving by Painter.

Hess' proof, by contrast, showed that in several locales where Hess and Petrol were in direct competition, the pricing battle was fierce, with now one station and now the other leading downward price movements. From this record, the most we can infer is that from time to time Hess, Kayo, Gibbs, Southern, and Payless succeeded in jointly raising their own retail prices.

On the second link, plaintiffs' proof was equally scant. Grossman and Painter testified that there was a correlation or interdependence between Hess wholesale and retail prices. As stated earlier, Grossman based Hess' wholesale price to Hess dealers on his perception of what the retail price should be; he then suggested a retail price which was normally followed. Defendant's Exhibit B shows that the Hess tank wagon price usually remained steady over periods when the retail price was changing. Voluntary allowances were shown by the exhibit to modify the prices paid by Hess dealers in the same direction as the retail prices charged by them, but there was no fixed relation between a dealer's retail price and the amount he paid to Hess. Instead, a movement in one was usually reflected by a movement in like direction, but of different magnitude, by the other.

This correlation fails to advance plaintiffs' case. First, contrary to Painter's self-serving and immaterial testimony regarding the pre-conspiracy period, Defendant's Exhibit B shows that the correlation during the conspiracy period was not "fixed" in the sense that a penny increase at retail would automatically result in a percentage of a penny in increased payment from the dealer to Hess. Second, Hess did not sell to plaintiffs at all, so the correlation does not force or even permit an inference that an increase in Hess retail or wholesale prices led to an increase in wholesale prices paid by plaintiffs to their suppliers. Thus, the case chiefly relied upon by plaintiffs, *Phillips v. Crown Cent. Petroleum Corp.*,[18] differs from this one in two crucial respects. In *Phillips*, the relationship between pump price and defendant's wholesale price was fixed, and as a result any pump increase was automatically passed on to plaintiffs, who were dealers buying their requirements from defendant.

Robert Kisler, an administrative assistant in Ashland's wholesale department in 1972 and 1973, testified that retail prices "could" affect Ashland's wholesale prices in the sense that when Ashland customers were charging a low retail price, they sought to obtain a correspondingly low wholesale price from Ashland. Other witnesses testified in essence that retail and wholesale prices generally moved in the same direction within a short time of each other. There was no evidence at all on the relationship between the wholesale and retail prices of Gibbs and Kayo.

We do not think that the evidence shows that the wholesale prices charged by the conspirators were "pegged" to retail prices. Kisler did not testify that retail prices actually did affect Ashland's wholesale prices, and there was no documentary evidence showing the degree of any such effect. Finally, Kisler's testimony did not touch at all on whether retail prices affected the wholesale prices charged by Ashland to plaintiffs.

The evidence also does not support a conclusion that the wholesale prices charged

---

18. *Supra*, 602 F.2d at 632–33.

generally at the Port of Albany were raised as a result of the conspiracy. Although it is unclear how many suppliers sold at wholesale there, we infer that there were about 25 from Painter's testimony that Petrol purchased from at least 15, or "more than half," of all the suppliers.[19] Plaintiffs did not introduce evidence showing how, if at all, wholesale prices at the Port of Albany related to Hess' prices. Nor did plaintiffs call witnesses from independent suppliers to testify as to any such relationship, or to testify as to how they made their pricing decisions. Yet, this is precisely the type of testimony required.[20]

Although there was some evidence showing the relationships among the prices of some suppliers at the Port of Albany, the evidence was highly inconclusive. Defendant's Exhibit U shows that, though Ashland and Gibbs occasionally charged more than other wholesalers, for substantial stretches during the conspiracy period the prices of Ashland and Gibbs were *lower* than those of non-conspirators Tenneco and Sousa.

On the third link, plaintiffs did not show that the prices they actually paid were raised because of the asserted linkage. Plaintiffs' Exhibit 13 shows that Petrol purchased from 13 different suppliers at the Port of Albany during the conspiracy period, only one of which, Ashland, was a conspirator. As stated above, there was no evidence that Ashland's prices to Petrol were higher simply because Ashland and two of its retail subsidiaries conspired with others to raise the retail prices of the subsidiaries. Nor was there anything to suggest that any of the remaining 12 non-conspiring suppliers of Petrol were affected at wholesale by Ashland's participation in the retail scheme. Indeed, there was evidence to the contrary. Painter testified that his price from Gasland had no relation to retail prices and that it was determined either by Gasland's posted price at Albany or by the posted price of a non-conspirator's crude oil, which concededly had no relation to retail gasoline prices.

Although VIP purchased from suppliers other than Ashland and Gibbs, it only seeks to recover from them. As stated above, however, the prices charged by these companies were often below those charged by non-conspirators. Moreover, VIP had the right, in its supply contracts with Gibbs' subsidiaries Astroline and Terminal, to break the contracts and buy from others if the subsidiaries declined to meet a competitor's lower price.[21] Spain of VIP testified that he invoked this clause on at least one occasion to buy gasoline from non-conspirator Sousa. Thus, far from being pegged to Hess or Gibbs retail prices, the wholesale prices paid by VIP for the bulk of its gasoline may properly be inferred to have been pegged, at VIP's option, to the wholesale prices of Gibbs' most cutthroat non-conspiring competitors.

In conclusion, plaintiffs have failed to prove that the conspiracy to fix retail prices resulted in overcharges to them at the wholesale level. Accordingly, we need not inquire into the amount of damages claimed.

Where, as here, plaintiffs allege that a conspiracy at one level of the distribution chain caused injury at a different level, courts, if they have allowed the action to proceed at all, have increasingly required that the proof be "detailed" and "particular" "as to individual transactions."[22] Here, the requisite detail and particularity is lacking. It is admittedly difficult, costly, time-consuming, and perhaps ultimately bootless to assemble such a quantity and quality of proof. Without such proof, however, courts and litigants face the twin dangers of speculative and unfair damage awards.

**19.** Tr. 999–1000.

**20.** *See Mid-West Paper Prods. Co. v. Continental Group, Inc., supra,* 596 F.2d at 585–86 & n.49; Comment, *Standing of Purchasers from Nonconspirators to Challenge Price-Fixing Conspiracy,* 93 Harv.L.Rev. 598, 605–06 (1980).

**21.** Plaintiffs' Exhibits 99, 100, 101.

**22.** *In re Beef Ind. Antitrust Litigation, supra,* 600 F.2d at 1166.

## IV. *Conclusion.*

The foregoing constitutes our findings of fact and conclusions of law, pursuant to Rule 52(a), Fed.R.Civ.P.

The actions are dismissed, and the Clerk ·is directed to enter judgments for defendant Amerada Hess Corporation.