MINPECO, S.A., Plaintiff,

v.

CONTICOMMODITY SERVICES, INC., Conticapital Management, Inc., Conticapital Limited, Norton Waltuch, Nelson Bunker Hunt, Lamar Hunt, William Herbert Hunt, International Metals Investment Co., Ltd., Sheik Mohammed Aboud Al-Amoudi, Sheik Ali Bin Mussalem, Naji Robert Nahas, Gilion Financial, Inc., ACLI International Commodity Services, Inc., Banque Populaire Suisse, Advicorp Advisory and Financial Corporation, S.A., Mahmoud Fustok, Merrill Lynch, Pierce, Fenner & Smith, Inc., Bache Halsey Stuart Shields, Inc., E.F. Hutton & Company, Inc., Commodity Exchange Inc., the Board of Trade of the City of Chicago, Continental Grain Company, and Walter Goldschmidt, Defendants.

Ronald GORDON, Plaintiff,

v.

Nelson Bunker HUNT, William Herbert Hunt, Lamar Hunt, International Metals Investment Co., Ltd., Sheik Mohammed Aboud Al-Amoudi, Sheik Ali Bin Mussalem, Faisal Ben Abdullah Al Saoud, Mahmoud Fustok, Naji Robert Nahas, Bache Halsey Stuart Shields, Inc., Bache Group, Inc., Merrill Lynch, Pierce, Fenner & Smith, Inc., Conticommodity Services, Inc., Conticapital Management, Inc., Conticapital Ltd., Norton Waltuch, Melvin Schnell, Gillion Financial, Inc., Banque Populaire Suisse, Advicorp Advisory and Financial Corporation, S.A., Commodity Exchange, Inc., the Board of Trade of the City of Chicago, ACLI International Commodity Services, Inc., Litardex Traders, S.A., and John Does Nos. 1 Through 15, Defendants.

Philip and Dorothy KORWEK, Mary Finkelstein, William L. Cohn and James G. Williams, Plaintiffs,

v.

Nelson Bunker HUNT, William Herbert Hunt, Lamar Hunt, International Metals Investment Co., Ltd., Sheik Mohammet Aboud Al-Amoudi, Sheik Ali Bin Mussalem, Faisal Ben Abdullah Al

Saoud, Mahmoud Fustok, Naji Robert Nahas, Bache Halsey Stuart Shields, Inc., Bache Group, Inc. (Prudential Bache Securities, Inc.), Merrill Lynch, Pierce, Fenner & Smith, Inc., Conticommodity Services, Inc., Conticapital Management, Inc., Conticapital Ltd., Norton Waltuch, Melvin Schnell, Gilion Financial, Inc., Banque Populaire Suisse, Advicorp Advisory and Financial Corporation, S.A., Commodity Exchange, Inc., the Board of Trade of the City of Chicago, Donaldson, Lufkin & Jenrette, ACLI Futures, Inc., formerly, ACLI International Commodity Services, Inc., Litardex Traders, S.A., Walter Goldschmidt, Continental Grain Co., Defendants.

Nos. 81 Civ. 7619 (MEL), 82 Civ. 1318 (MEL), 84 Civ. 7934 (MEL).

United States District Court, S.D. New York.

Nov. 17, 1987.

Cole & Corette, Washington, D.C., for plaintiff Minpeco, S.A.; Mark A. Cymrot, Thomas O. Gorman, Scott D. Andersen, of counsel.

Deutsch & Frey, New York City, for plaintiffs Ronald Gordon and Philip and Dorothy Korwek.

Kaye, Scholer, Fierman, Hays & Handler, New York City (Aaron Rubinstein, Stanley D. Robinson, Phillip A. Geraci, Manvin S. Mayell, of counsel), Gardere & Wynn, Dallas, Tex. (Robert E. Wolin, of counsel), for defendant Lamar Hunt.

Curtis, Mallet–Prevost, Colt & Mosle, New York City, for defendant Mahmoud Fustok; Herbert Stoller, Turner P. Smith, of counsel.

Rogers & Wells, New York City, for defendants ACLI Intern. Commodity Services, Inc. and Merrill Lynch, Pierce, Fenner & Smith, Inc.; William R. Glendon, Jerry W. Markham, of counsel.

Debevoise & Plimpton, New York City, for defendant ACLI Intern. Commodity Services, Inc.; Andrew C. Hartzell, Jr., Michael E. Wiles, Edwin G. Schallert, Jonathan Richman, Mary Sue Henifin, of counsel.

Sullivan & Cromwell, New York City, for defendants Prudential–Bache Securities, Inc. and Bache Group Inc.; Marvin Schwartz, Richard H. Klapper, John L. Hardiman, of counsel.

LASKER, District Judge.

In this action arising out of the crisis in the silver market in 1979–1980, Minpeco alleges that, under the leadership of Bunker and Herbert Hunt, a number of silver futures traders and the brokerage houses who handled their silver futures accounts participated in a conspiracy to manipulate upward the price of silver and silver futures. Five defendants have moved for summary judgment on the ground that the evidence of record is insufficient to establish their participation in this conspiracy. Moving defendants are ACLI International Commodity Services, Inc. ("ACS"), Prudential–Bache Securities, Inc. ("Bache"), and Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"), brokerage houses who provided services to the alleged trading conspirators,[1] and Mahmoud Fustok and Lamar Hunt, who were individual silver traders. Although these well-briefed and argued motions present difficult and close questions, I conclude that the record contains sufficient evidence from which a reasonable jury could find that these five de-

fendants participated in a conspiracy to manipulate silver prices. The jury, aided by the live testimony of witnesses subject to cross-examination, must decide whether the moving defendants participated in the conspiracy alleged. Accordingly, the motions for summary judgment are denied.

The gravamen of Minpeco's claims is that a conspiracy led by Bunker and Herbert Hunt, supported by two groups of wealthy investors, including Lamar Hunt and Fustok, and knowingly assisted by the defendant brokerage firms, caused the dramatic rise in silver prices from August 1979 to January 1980. The goal of the alleged conspiracy was to manipulate upward the price of silver and silver futures contracts. Minpeco alleges that defendants' conspiratorial activity violated 1) §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2; 2) § 9(b) of the Commodity Exchange Act, 7 U.S.C. § 13(b); 3) the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–65; and 4) N.Y.Gen.Bus.Law § 340 and New York common law.[2]

According to Minpeco, there were two so-called "groups" of trading conspirators: the Hunt Group and the Conti Group. The key members of the Hunt group were the three Hunt brothers and the International Metals Investment Company ("IMIC"), a Bermudian corporation established in July 1979 and controlled by Herbert and Bunker Hunt and several Arab investors. The Conti Group consisted of a coalition of Swiss and Arab bankers and traders, including Naji Nahas, moving defendant Fustok, and Advicorp Advisory Financial Services S.A. ("Advicorp"), who traded in large part through ACS and through Norton Waltuch, a trader with ContiCommodity Services, Inc. ("Conti"). The trading defendants' role in the alleged conspiracy was to create the appearance of new investor demand in silver and to buy as much of the certificated silver bullion in the Com-

---

1. Bache and its affiliate Bache Group, Inc. have also moved for summary judgment in *Gordon v. Hunt*, 82 Civ. 1318 (MEL) and *Korwek v. Hunt*, 84 Civ. 7934 (MEL). For the sake of consistency, this opinion will refer to all plaintiffs as "Minpeco."

2. Minpeco's claims under CEA § 4b, 7 U.S.C. § 6b, and the Martin Act, N.Y.Gen.Bus.Law § 352–c, were dismissed as to all defendants by endorsement dated November 9, 1987.

modity Exchange, Inc. ("Comex") and Chicago Board of Trade ("CBT") warehouses as possible by taking delivery on silver futures contracts.

The broker defendants are alleged to have known about the conspiracy both through objective market conditions indicating that the silver market was being manipulated, and through the direct knowledge of their employees from working with and observing the Hunt and Conti groups. Minpeco claims that, motivated by the opportunity to profit from increased trading and higher prices in silver and by the desire to curry favor with the Hunts, the broker defendants joined the conspiracy by assisting the Hunt and Conti groups in three major ways: 1) allowing manipulative trading; 2) financing the conspiracy; and 3) deceiving the exchanges and the Commodity Futures Trading Commission ("CFTC").

The moving defendants do not dispute that they were significantly involved in silver trading in 1979–1980, nor, of course, do they dispute the dramatic rise and fall of silver prices. They argue, however, that the only evidence garnered by Minpeco after years of massive discovery is at least as consistent with legitimate, independent action as with participation in a conspiracy. Hence, they contend that the conspiracy claims must be dismissed as to them as a matter of law.[3]

### Discussion

Three recent Supreme Court decisions— *Matsushita Electric Industrial Co. v. Zenith Radio Corporation*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corporation v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—and a recent opinion of the Court of Appeals for this circuit, *Apex Oil Co. v. DiMauro*, 822 F.2d 246 (2d Cir.1987), articulate the standards to be applied in motions for summary judgment under Fed.R.Civ.P. 56.

The Supreme Court has stressed that to establish a "genuine issue for trial" on a motion for summary judgment, the non-moving party must show more than "some metaphysical doubt as to the material facts," *Matsushita*, 106 S.Ct. at 1356. The *Matsushita* court made clear that "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party there is no 'genuine issue for trial.'" *Accord, Anderson*, 106 S.Ct. at 2511 (threshold inquiry is whether "there are any genuine issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party").

However, while *Matsushita* and *Anderson* stand for the proposition that the trial court must carefully scrutinize the record to determine whether genuine issues for trial exist, the Supreme Court has also reaffirmed that:

> Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.

*Anderson*, 106 S.Ct. at 2513–14 (citations omitted); *accord Apex*, 822 F.2d at 253 ("question of what weight should be assigned to competing permissible inferences remains within the province of the factfinder at trial").

---

3. Defendants' primary argument is that Minpeco has failed to produce sufficient evidence in support of its antitrust conspiracy claims. Defendants then argue that because there is insufficient evidence of participation in an antitrust conspiracy, Minpeco's other conspiracy claims are similarly deficient. The conclusion that there are sufficient genuine issues for trial on Minpeco's antitrust conspiracy claims necessitates denial of the summary judgment motions as to all claims.

To establish that the moving defendants participated in the antitrust conspiracy alleged, Minpeco must present direct or circumstantial evidence that reasonably tends to prove that the defendants had a conscious commitment to a common scheme to achieve an unlawful objective. *See Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984); *Apex*, 822 F.2d at 252. In determining whether a plaintiff has produced sufficient evidence to prove such a commitment, *Matsushita* and *Apex* clarify that "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 [Sherman Act] case." *Matsushita*, 106 S.Ct. at 1357; *accord, Apex*, 822 F.2d at 252.

First, "conduct as consistent with permissible conduct as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita*, 106 S.Ct. at 1357; *accord, Apex*, 822 F.2d at 252. There must be evidence in the record that "tends to exclude" the possibility that the alleged conspirators were acting independently, rendering the inference of conspiracy reasonable in light of the competing inferences of independent action. *Matsushita*, 106 S.Ct. at 1357; *Apex*, 822 F.2d at 252. Hence, evidence of defendants' parallel conduct is, by itself, insufficient: a plaintiff "must show the existence of additional circumstances, often referred to as 'plus' factors, which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy." *Apex*, 822 F.2d at 253. These "plus" factors include: a common motive to conspire, a high level of "interfirm" communications, and evidence that the parallel acts were "against the apparent individual economic self-interest of the alleged conspirators." *Id.* at 254. However, evidence of parallel conduct is not irrelevant because:

[a] court deciding whether to grant summary judgment should not view each piece of evidence in a vacuum. Seemingly innocent or ambiguous behavior can give rise to a reasonable inference of

conspiracy in light of the background in which the behavior takes place.

*Id.* at 254–55.

Second, the economic plausibility of the plaintiff's claims is relevant to a determination whether genuine issues exist for trial: if the claim is one that "simply makes no economic sense," the plaintiff must come forward with more persuasive evidence to support its claim than would otherwise be necessary. *Matsushita*, 106 S.Ct. at 1356. Furthermore, in the antitrust context:

[l]ack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence: if [defendants] had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy.

*Id.* at 1361.

With these principles in mind, each defendant's motion is discussed briefly below. At the outset, however, several general comments are in order which apply equally to the five motions. First, it is clear from the record that there are genuine issues for trial as to the existence of the core conspiracy to raise silver prices which Minpeco has alleged: Minpeco has produced evidence of parallel conduct, a high level of communications, and a common motive to conspire at least as to defendants Bunker and Herbert Hunt, IMIC and Nahas. In fact, the moving parties do not argue that Minpeco's conspiracy claims should be dismissed altogether. Instead, each moving defendant argues simply that there is insufficient evidence to establish his—or its—participation in the alleged conspiracy. This distinction is relevant because in *Apex*, the Court of Appeals, after finding that there were genuine issues of fact as to one defendant's participation, noted that " 'once a conspiracy is shown, only slight evidence is needed to link another defendant with it.' " *Apex*, 822 F.2d at 258 (quoting *United States v. Wilkinson*, 754 F.2d 1427, 1436 (2d Cir.), *cert. denied*, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985)). However, this precept does

not relieve Minpeco of its burden to demonstrate genuine issues for trial as to each of the five moving defendants. Indeed, the *Apex* court, after finding sufficient evidence of participation in the alleged conspiracy as to one defendant, affirmed the granting of summary judgment as to all the other defendants because it could not "find such a link" as to any of the other defendants. *Id.* at 258.

Second, the *Apex* court distinguished between conspiracies which concern "long-term complex relationships among competitors," where the conspiracy is more susceptible to direct proof, and cases "where the alleged scheme is simple in operation" and "as a practical matter ... the best proof available most often will only tend to show the existence of an informal, perhaps even tacit, rather than explicit, agreement." *Apex*, 822 F.2d at 253. The moving defendants here argue that because long-term complex relationships are involved in this case, it is more like *Matsushita* than *Apex*, and the lack of direct proof as to their participation in the conspiracy is significant. However, the scope of the conspiracy alleged here falls between those described in *Matsushita* and *Apex:* it is alleged to have lasted longer than the one-time squeeze pictured in *Apex*, but not as long as the twenty-year cartel among competitors in *Matsushita*. Furthermore, at its core the conspiracy alleged here, like that in *Apex*, is relatively simple: the defendants are said to have worked together to raise silver prices by cornering the supply of silver. Hence, while the lack of direct evidence makes plaintiff's case harder to prove, it does not render the conspiracy portrayed implausible *per se*.

Finally, *Apex* reaffirms that all reasonable inferences must be drawn in favor of Minpeco, viewing the evidence as a whole. *See Apex*, 822 F.2d at 252–53. This case—like *Apex*—turns on the competing inferences that may reasonably be drawn from largely undisputed facts. Once it is concluded that the record supports a reasonable inference that each moving defendant participated in the alleged conspiracy, it is for the jury to choose between Minpeco's

version of events and that of the defendants.

### I. *The Broker Defendants*

The brokers' motions for summary judgment present substantial questions, particularly whether Minpeco has produced sufficient evidence of the brokers' knowing participation in the conspiracy.

▮ First, in the face of unqualified denials of participation and knowledge by high-ranking executives from the three brokerages, Minpeco must establish that each brokerage house had actual knowledge of the essential nature and general scope of the conspiracy alleged. Minpeco need not prove, however, that each broker knew the exact limits of the alleged scheme or the identity of all the participants. *See United States v. Barnes*, 604 F.2d 121, 154–55 (2d Cir.1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1388, 64 L.Ed.2d 260 (1980); *Rich–Taubman Associates v. Stamford Restaurant Operating Co.*, 587 F.Supp. 875, 879 n. 5 (S.D.N.Y.1984). Nor can a defendant evade liability for participation in a conspiracy by consciously avoiding knowledge of a scheme's unlawful aims and objectives. *See United States v. Lanza*, 790 F.2d 1015, 1022 (2d Cir.1987), *cert. denied*, —— U.S. ——, 107 S.Ct. 211, 93 L.Ed.2d 141 (1986).

▮ Second, there must be evidence of record showing knowledge on the part of the brokers' employees which can be imputed to the corporation itself. The brokers may be bound by the acts and declarations of a managerial employee acting within the scope of his authority. *See United States v. Koppers Co.*, 652 F.2d 290, 298 (2d Cir.), *cert. denied*, 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 617 (1981).

Third, Minpeco argues that the broker defendants must have known about the conspiracy because of their knowledge of market conditions. According to Minpeco's theory, objective economic indicators such as the allegedly unusual pattern of silver spreads, silver price volatility, and non-proportionality of silver with gold prices must have alerted market professionals to the manipulation of the silver futures market. The brokers respond that plaintiffs' analy-

sis of market conditions is flawed and, at most, an exercise in hindsight.

▋ The extent to which objective indicators demonstrated manipulation is significant to Minpeco's core claim that manipulation did in fact occur and provides relevant background to Minpeco's claim that the brokers were aware of the conspiracy. *See Apex*, 822 F.2d at 254–55 (evidence on summary judgment not to be viewed in a vacuum). However, generalized knowledge on the part of the brokers that the silver market was receiving artificial stimuli is insufficient, alone, to demonstrate a conscious commitment to join and further the specific conspiracy charged.

## A. *ACLI Internal Commodity Services, Inc.*

▋ It is not disputed that during the 1979–1980 period, at least twelve entities and individuals with some connection to Advicorp, the largest of which were BPS and Litardex, traded silver futures contracts through commodity trading accounts at ACLI Commodity Services, S.A. ("ACS Geneva"), ACS' Geneva branch, as did Herbert and Bunker Hunt. In addition, ACLI International, Inc., ACS' parent company, loaned Herbert and Bunker Hunt as much as $135 million in the period from October 1979 to March 1980, collateralized by silver.

ACS argues, however, that scrutiny of the evidence of record can only lead to the reasonable conclusion that ACS had no knowledge of any conspiracy between the Advicorp and the Hunt groups and that it only provided its Advicorp-related clients and the Hunts with legitimate financial services motivated by sound business reasons. Certainly ACS' explanation of its activities is a possible interpretation of the facts. Plaintiffs, however, as indicated below, have provided sufficient evidence from which a reasonable jury could reach a differing conclusion: that ACS knew its Advicorp clients and Hunt clients were engaged in a collective manipulation of the silver and silver futures market, and that ACS knowingly joined the conspiracy by various acts, most importantly by shielding the conspirators' activities from the CFTC and Co-

mex. It is for the jury to choose which of these competing reasonable conclusions to draw. *See Apex*, 822 F.2d at 252.

### 1) *Knowledge of the Conspiracy*

Minpeco has presented sufficient evidence from which a jury could reasonably conclude that ACS knew that the Conti group and the Hunt group were collectively engaged in manipulative trading. First, it could be reasonably concluded, based on the testimony on letters rogatory of Jean-Francois St. Severin, an account executive at ACS Geneva in 1979, combined with statements in the affidavits submitted by higher-level ACS officials, that for at least a significant period of the conspiracy ACS knew that Advicorp was related to and had some control over the twelve accounts opened at ACS' Geneva branch in 1979–1980, and that Nahas was also related to these Geneva accounts. It could also be inferred that ACS knew that the Conti group was acting together with the Hunt group, based on evidence of Bunker Hunt's presence at a meeting between Nahas, Selim Nassif, and ACS officials to discuss problems with the Advicorp accounts, coupled with evidence of knowledge that Advicorp was placing trades for the Hunts.

Second, a jury could reasonably conclude that ACS knew that at least some of the holders of the Advicorp-related accounts at ACS Geneva were engaged in manipulative trading. In addition to the alleged changes in BPS' silver trading pattern—such as increased deliveries and trading in congested months—which Minpeco argues displayed the classic indicia of manipulative trading and which ACS argues were consistent with normal, legal behavior, there is also evidence that ACS knew that BPS was resisting Comex's efforts to regulate the silver futures market by encouraging traders to reduce their long silver positions in congested months.

### 2) *Acts in Furtherance of the Conspiracy*

Minpeco alleges that ACS engaged in three types of actions in furtherance of the conspiracy: 1) ACS permitted its Advicorp-

related accounts to engage in manipulative trading; 2) ACS knowingly loaned money to the Hunts to finance the conspiracy's manipulative activities; and 3) ACS deceived the CFTC and Comex to shield the conspirators from adverse regulation. The cumulative weight of this evidence is sufficient to permit a juror reasonably to infer that ACS knowingly engaged in acts which furthered the alleged conspiracy.

First, the evidence of record permits a reasonable inference that ACS allowed the Advicorp-related accounts to engage in manipulative trading activity and that ACS knowingly financed the conspiracy through loans to the Hunts. The types of trading and financial services which ACS provided to the Advicorp-related accounts were routine and legal and can not, without more, give rise to an inference of participation in a conspiracy. Evidence of record, however, suggests that by allowing its Advicorp-related accounts to take large positions in silver, in combination with the extension of loans collateralized by silver, ACS exposed itself to potential liability far exceeding its net worth. This over-extension could permit an inference that ACS was acting against its economic interest, one of the "plus" factors which tends to exclude the possibility of independent legitimate behavior. *See Apex*, 822 F.2d at 254. Furthermore, there are genuine issues as to whether BPS' and Litardex' large-scale trading in December 1979 silver violated an ACS internal policy of limiting its customers to no more than 10% of the open interest in a particular month, further excluding the possibility of independent behavior.

ACS also argues that its termination of BPS' account at the end of November 1979 contradicts Minpeco's conspiracy claim. Clearly this termination could be viewed as inconsistent with the charge that ACS was assisting the conspiracy. But the evidence as to the circumstances of this termination, which apparently was sparked by a dispute over the terms for a delivery of December silver, including evidence that ACS attempted to obtain for BPS the financing

necessary for the account to remain at ACS, is also subject to the conflicting reasonable interpretation that in fact ACS did everything possible to try to keep BPS' account.

ACS' trading and financial assistance to the Advicorp-related accounts and the Hunts might, in isolation, be viewed as equally consistent with legitimate, independent business activity as with participation in the conspiracy, and hence insufficient under *Matsushita* and *Apex* to allow a reasonable inference in support of Minpeco's claims. However, Minpeco has also produced evidence which could be interpreted as establishing that ACS, despite ample notice of its obligation to assist Comex in regulating the silver futures market, intentionally withheld from Comex pertinent information about the Advicorp-related accounts. This evidence, again, is subject to conflicting interpretations. But, drawing justifiable inferences in favor of the non-moving party, *see Anderson*, 106 S.Ct. at 2513–14, it does tend to exclude the possibility of legitimate business activity. *See Apex*, 822 F.2d at 254.

First, on November 8, 1979, Lee H. Berendt, then president of Comex, wrote to Henry Maringer, then ACS' president and chief operating officer, to express his concern that BPS was not voluntarily reducing its positions in December 1979 silver, raising concerns "about the willingness of ACLI and/or its customer to cooperate with Comex...."[4] Berendt also advised that further reductions should be accomplished by liquidating or switching into maturities not earlier than May 1980 and particularly requested ACS' cooperation in avoiding potential congestion in March 1980 silver on Comex. On November 12, 1979, Maringer responded that ACS had repeatedly informed BPS of Comex's requests, and "urged our customer to comply [but that] ... we have thus far been unable to prevail upon our customer to do so," and expressed surprise at Comex's "apparent confusion between the actions of ACLI and

---

**4.** Plaintiffs' Exhibit ("PX") E–43 (letter to Henry Maringer from Lee H. Berendt, November 8, 1979).

the actions of its customers." [5] Yet, in a November 9, 1979 file memorandum describing ACS' communications with BPS about its trading, Maringer does not mention having advised BPS to avoid maturities earlier than May 1980 and in fact refers to an agreement between ACS and BPS "that we would go up to 4000 lots total position, however, any new positions would be for March delivery onward." [6] In fact, BPS continued to increase its positions at ACS in December 1979 and March 1980 silver until November 27, 1979, just a few days before the BPS account at ACS was closed. This evidence, while not the "smoking gun" which Minpeco labels it, supports the conclusion that ACS was shielding BPS from the Comex investigation.

Second, there are genuine issues for trial as to whether Maringer, when testifying at a November 1979 Comex deposition on the subject of the Advicorp-related accounts, knowingly misrepresented the extent to which the ACS Geneva accounts under investigation were related by failing to tell Comex that six new Advicorp-related accounts had recently been opened at ACS Geneva.

It is only fair to note that Maringer has emphatically denied any intention to deceive Comex, and that ACS has produced evidence that after the November deposition, ACS did in fact provide Comex with information concerning the new Geneva accounts. However, it is for the jury, with the invaluable aid of Maringer's testimony on the stand, to decide whether his denials should be accepted and how to resolve the apparently conflicting evidence. *See Apex,* 822 F.2d at 256.

### 3) *Motivation*

The most significant motive for ACS' alleged participation in the conspiracy is the stake of its parent, ACLI, Inc., in the price of silver. ACLI, Inc. traded silver futures contracts and physical silver. The record shows that ACLI, Inc.'s silver positions were largely hedged, rendering the

bulk of its silver holdings impervious to shifts in price, but it is also undisputed that ACLI, Inc. was "net at risk," holding net unhedged long silver positions. Although these net unhedged positions were not large, they demonstrate that to an extent ACLI, Inc. was enriched by the rise in silver prices. Of course, as a broker, ACS also had a motive to preserve an orderly and healthy silver futures market, and the jury will have to weigh the significance of these competing motivations. However, Minpeco has established that this is not a case in which Minpeco's claim as to ACS "simply makes no economic sense." *Matsushita,* 106 S.Ct. at 1356.

### B. *Prudential–Bache Securities Inc.*

In the early 1970s, Bunker and Herbert Hunt opened substantial silver futures trading accounts at Bache, and by October 1979, the Hunt accounts had the largest credit line at Bache. From October 1979 through March 1980, Bache approved loans to the Hunts collateralized by silver which eventually totalled approximately $233 million. Bache argues that provision of these normally legitimate trading and financial acts to Bunker and Herbert Hunt cannot support an inference that Bache knew about, let alone assisted, the multi-member conspiracy charged. However, as described below, Minpeco has presented evidence which raises genuine issues for trial, particularly as to Bache's knowledge of the conspiracy through its employee Scott McFarland and as to Bache's motive to participate in the alleged conspiracy.

### 1) *Knowledge of the Conspiracy*

Although only Bunker and Herbert Hunt had trading accounts at Bache, there is sufficient evidence to permit the conclusion that Bache knew not only of manipulative trading on the part of the Hunts but also knew that other traders were acting together with the Hunts.

In addition to the general evidence as to objective market · indicators discussed

---

**5.** PX E–45 at p.2 (letter from Henry Maringer to Lee H. Berendt, November 12, 1979).

**6.** PX E–44 (ACS memorandum dated November 9, 1979).

above, Minpeco has presented specific evidence from which it could be inferred that Bache knew of the Hunts' manipulative intent. Minpeco's evidence permits the inference that by October 1979 Bache knew that the Hunts' position at Bache of 6,900 silver futures contracts was one-third of the Hunts' over-all long silver futures positions.[7] This meant that the Hunts controlled 100,000,000 ounces of silver, close to 100% of the Comex and CBT warehouse stocks at that time.[8] Hence, Bache had information strongly suggesting that the Hunts were in the process of establishing a dominant position in the silver futures market, an important indicator of manipulative intent. See Cargill, Inc. v. Hardin, 452 F.2d 1154, 1164 (8th Cir.1971), cert. denied, 406 U.S. 932, 92 S.Ct. 1770, 32 L.Ed.2d 137 (1972).[9] Evidence of Bache's knowledge of this trading behavior, coupled with evidence of other indicia of manipulative trading at Bache, and with Bache's knowledge of Bunker and Herbert Hunt's prior unusual, if not suspicious, silver trading behavior while at Bache, permits a reasonable inference that Bache knew of the Hunts' manipulation.

Second, as to Bache's knowledge of the scope of the conspiracy, the record indicates that in the mid–1970s, prior to Scott McFarland's employment as an account executive at Bache, Bunker Hunt enlisted Scott McFarland to make contacts with Arab investors to whom Hunt could sell silver and persuade to buy silver. Evidence of record also allows the inference that McFarland knew at that time that the purpose of recruiting these new investors was to further Bunker Hunt's plan to manipulate silver prices upward. McFarland's knowledge of the scope and purpose of the conspiracy, because it was acquired when he was working as the Hunts' broker for other brokerage houses, may not be imputed to Bache unless McFarland had this information in mind when he conducted silver transactions for the Hunts while he was employed at Bache. See Phelan v. Middle States Oil Corp., 210 F.2d 360, 365–66 (2d Cir.1954); see also Ferrara v. Scharf, 466 F.Supp. 125, 131 (S.D.N.Y. 1979). However, the evidence of record permits this inference and presents an issue for the jury.

2) *Acts in Furtherance of the Conspiracy*

There is sufficient evidence of record to permit an inference that Bache knowingly participated in the conspiracy by allowing manipulative trading, providing the Hunts with financial assistance and by shielding them from the regulators. Two genuine issues for trial will be mentioned briefly.

From October 1979 to March 1980, Bache made three loans to the Hunts, totalling $233,000,000, collateralized by silver, and authorized a fourth loan which was never made. The timing of these loans, two of which were authorized just after Comex raised its margin requirements for silver futures accounts, permits the inference that Bache knew that the purpose of these loans was to help the Hunts maintain and build their silver positions in the face of Comex's efforts to force them to reduce their positions.

There is also evidence permitting the inference that Bache protected the Hunts from Comex regulation by refusing to aggregate and reduce the Hunt accounts after Comex imposed position limits and aggregation rules on January 7, 1980, despite two instructions from Comex to do so.

7. See PX H–52 at 143–50 (Deposition of Harry Jacobs).

8. PX I–91; I–131 (Silver Trading Statistics, 1979).

9. Bache argues that under the CFTC's recent decision in *In Re Cox*, [1986–1987 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 23,786 (CFTC 1987), a dominant position in the deliverable supply, as opposed to in the futures market, is a necessary element of a manipulative squeeze. As a result, Bache argues that knowledge of the size of the Hunts' long futures positions could not have signalled to Bache that the Hunts were engaging in a corner or manipulative squeeze. However, *In re Cox* is not, of course, binding on this court, and even if that decision were followed, evidence of Bache's knowledge of the Hunts' dominant position in futures contracts could still be relevant to the question whether Bache knew of the alleged conspiracy.

### 3) *Motivation*

Minpeco has produced evidence which supports two motives for Bache's participation in the alleged conspiracy. First, in 1979 commissions from the Hunt loans constituted almost 90% of the annual income of Charles Mattey, the Hunts' senior account executive at Bache.[10] Bache treasurer Langdon Stevenson testified on deposition that he thought that at least "to some degree" these commissions affected Mattey's objectivity in casting votes on the Bache commodity credit committee in favor of extending credit to the Hunts.[11] Second, beginning in October 1979, Bache received significant assistance from Bunker and Herbert Hunt in fending off a hostile takeover. In April 1980, William Marlin, vice-chairman of the Bache Board, told the Bache audit committee investigating Bache's involvement in the silver crisis that the fact that the Hunts owned Bache stock had an impact on the Bache board's dealings with the Hunts—although his testimony also indicates that he did not think that Bache gave the Hunts extra time to meet their obligations when the price of silver plummeted.[12] This evidence permits an inference that the financial well-being of Mattey, Bache, and the Hunts were highly inter-connected and demonstrates, at the least, that this is not a case where there was no rational economic motive to conspire. *See Matsushita,* 106 S.Ct. at 1361.

### C. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*

The record reflects that beginning in 1974, Merrill Lynch maintained a close financial relationship with Herbert and Bunker Hunt. IMIC from its inception also traded through Merrill Lynch, and in 1979–1980 Merrill Lynch lent both the Hunts and IMIC substantial sums. As with ACS and Bache, Minpeco has presented evidence which raises genuine issues for trial as to Merrill Lynch's knowledge of and participation in the conspiracy.

10. PX H–61 at 15–16 (Mattey deposition).

11. PX H–89 at 280–281 (Stevenson deposition).

### 1) *Knowledge of the Conspiracy*

In addition to the evidence of economic indicators demonstrating market manipulation discussed above, Minpeco has presented evidence permitting an inference that Merrill Lynch had specific knowledge of the scope of the conspiracy. First, there is evidence supporting the claim that Merrill Lynch knew, as early as August 1979, that IMIC was a partnership between the Hunts and several Arab investors. There is also evidence to support an inference that Merrill Lynch knew of the connection between BPS and Fustok by December 1979. Finally, it is undisputed that Merrill Lynch knew that in 1977, after Merrill Lynch had financed the Hunts' trading in soybean futures, the Hunts were found guilty by the CFTC of violating commodities laws in connection with the soybean futures market. This knowledge of the Hunts' past commodities violations, in combination with the objective economic factors indicating market manipulation in 1979–1980, supports a reasonable inference that Merrill Lynch knew of the alleged conspiracy.

### 2) *Acts in Furtherance of the Conspiracy*

As with Bache and ACS, Minpeco alleges that Merrill Lynch assisted the conspiracy by permitting manipulative trading, loaning money to the conspirators, and deceiving the regulators. Two genuine issues for trial deserve mention. First, there is evidence which could permit the inference that the purpose of the large loans made to the Hunts and IMIC in 1979–1980 was to finance the Hunts' deliveries of silver in furtherance of the alleged conspiracy. Although Merrill Lynch characterizes the loans as normal business transactions equally consistent with permissible behavior as with participation in a conspiracy, there is support in the record for the con-

12. PX D–65 at p.3 (notes of Bache Audit Committee regarding interview with Bill Marlin) ("Subconsciously there was an impact there. We owed [sic] them a favor. Did we give them extra time. Probably not, may be one day.").

clusion that the decision to finance the Hunts' deliveries was a controversial departure from the norm. Second, there is evidence that when the CFTC contacted Merrill Lynch in early September 1979 to inquire who owned and controlled IMIC, Merrill Lynch representatives denied having such information, even though it is clear that Merrill Lynch knew from the time of IMIC's incorporation that the Hunts substantially controlled IMIC. While Merrill Lynch has presented evidence indicating that later in September Merrill Lynch pressured IMIC to disclose the Hunts' interest to the CFTC, it is the jury which must decide the weight to be assigned to conflicting evidence.

### 3) *Motivation*

Minpeco alleges that Merrill Lynch's motivation to participate in the conspiracy arose from the significant commission and interest income produced by the Hunt accounts and from Merrill Lynch's desire to keep the Hunts' goodwill. Merrill Lynch, in response, argues that any interest it had in keeping the Hunts' accounts was far outweighed by its interest in preserving its reputation and maintaining a healthy commodities market for all of its customers. Merrill Lynch also contends that Minpeco's claims against it are internally inconsistent: in its conspiracy claims, Minpeco charges that Merrill Lynch schemed to assist traders with long silver futures positions to raise silver prices, but in its breach of fiduciary duty claims, Minpeco charges that Merrill Lynch encouraged Minpeco to sell silver short on a massive scale, which would tend to lower silver prices. These arguments, however, must be made to the jury. It cannot be concluded on the present record that Merrill Lynch's alleged participation in the conspiracy is wholly implausible.

### II. *The Trading Defendants*

With *Apex* as a guide, Fustok and Lamar Hunt's motions for summary judgment are considered in light of evidence of parallel conduct and the requisite "plus factors" necessary to permit a finding of participation in an antitrust conspiracy, focusing on the level of communication among the defendants and the consistency of the parallel acts with the defendant's economic self-interest. A third plus factor, a common motive to conspire, is apparent: because both defendants had large investments in silver, they had a motive to conspire to raise the price.

### A. *Mahmoud Fustok*

█ Fustok, a Lebanese citizen, business associate of Nahas, and active investor and trader in race horses, makes three defensive arguments to the charge that he participated in the conspiracy alleged by Minpeco: First, that in many instances the trades carried out in his name which Minpeco claims are evidence of his conspiratorial activity were not, in fact, authorized by him.. Second, that some of the members of the conspiracy alleged by Minpeco actually cheated and defrauded Fustok himself. Third, that he acted independently and that there is no direct nor sufficient evidence that he made a conscious commitment to join the conspiracy. To the extent that Fustok can prove that acts of his which Minpeco alleges were conspiratorial acts were not authorized by him explicitly or impliedly or as a matter of law, such acts cannot be considered in determining whether he was a member of conspiracy. For the purposes of this motion, though, to the extent Fustok argues that he did not authorize acts alleged by Minpeco, he raises issues for trial. Fustok's second point, that he was defrauded or cheated by some of the alleged conspirators, would not, even if proven, constitute a defense against Minpeco's charges. Finally, a reasonable juror could conclude, based on the evidence Minpeco has produced, that Fustok joined the alleged conspiracy.

Minpeco alleges that, beginning in August 1979, Fustok engaged in at least four types of parallel conduct in furtherance of the conspiracy: 1) he purchased large quantities of physical silver and silver futures contracts at a time when other defendants, principally Nahas, Waltuch, and Advicorp also increased their positions; 2) he, as did other alleged conspirators, took large deliveries of physical silver during

the fall of 1979 and early 1980, although prior to this time he had taken few deliveries; 3) both Fustok and Nahas shipped tons of physical silver out of the United States, sometimes on the same plane; and 4) Fustok, IMIC, Herbert and Bunker Hunt all applied to open accounts at Swiss Bank Corporation ("SBC") in the same week and then purchased silver from SBC on the Zurich market after COMEX had established position limits on silver purchases on its exchange.

Fustok argues that this conduct was as consistent with independent behavior as with participation in a conspiracy. He maintains that he began purchasing large quantities of silver believing it to be a wise investment and that, as indicated above, he did not authorize every purchase made on his behalf.[13] Fustok also argues that he took delivery of silver to satisfy the bank collateral requirements. Finally, in response to Minpeco's argument that he evaded U.S. regulators by purchasing abroad, Fustok answers that he was not informed of the Comex limits and that on the only occasion he was aware the regulators sought his cooperation, he complied by authorizing BPS to disclose his name and the nature and extent of his silver transactions to the CFTC.

Although this parallel conduct may be susceptible to inferences of independent action, Minpeco has also produced evidence of Fustok's communication with other conspirators—a "plus factor"—principally his participation in meetings and phone calls with other alleged conspirators, some examples of which are:

(1) After an August 1979 dinner with Nahas, Bunker Hunt, and Antoine Asfour in Deauville, France, at which the shortage of silver and silver prices and the likelihood of their going up were discussed, Fustok instructed his advisor to order $30–40 million of physical silver for his account.

(2) During September, October, and November 1979, Fustok met Nahas every two days at the racetrack, on which occasions, according to Fustok's deposition, they discussed silver and Nahas informed Fustok that Bunker Hunt had invested $150 to $200 million in silver.[14] Fustok's deposition also indicates that he and Nahas, in a phone call during those months, discussed the facts that Advicorp's planes were shipping Fustok's silver from the United States to Switzerland and that Nahas and Bunker Hunt were also shipping silver out of the United States.

(3) Fustok participated in meetings and agreements to share losses with other alleged conspirators once the price of silver fell.[15] At one meeting in March 1980, Nahas and Bunker Hunt sought Fustok's participation in their plan to pool their silver and use it to back bonds so silver would return to its old price, since the three owned "more than half of the world." [16] Fustok, upon learning that Hunt was going to Saudi Arabia, gave him names of people who might help him with his finances. There is a factual dispute whether Fustok proposed an agreement, which was never finalized and which would have provided that Fustok, Nahas, and Bunker Hunt would cover, jointly and severally, 50% of the losses sustained by Advicorp because of its trading in BPS' omnibus account.

The first two examples mentioned are explained, according to Fustok, by the shared interest in horses of Fustok, Nahas,

13. This argument is undercut by the decision in *Fustok v. ContiCommodity Services, Inc.,* 610 F.Supp. 986, 989 (S.D.N.Y.1985) granting defendants summary judgment on Fustok's claims of unauthorized trading. Evidence showed that Fustok authorized Advicorp to trade silver futures contracts worth hundreds of millions of dollars, despite his allegation that he had not authorized purchases exceeding $30–40 million.

14. PX H–29 at 655 (Deposition of Fustok in *Minpeco v. ContiCommodity* ).

15. Even if it were to be argued that these acts occurred in a post-conspiracy period, the evidence would be admissible if it is probative of the existence of the conspiracy. *See United States v. Koppers Co.,* 652 F.2d 290, 298 (2d Cir.), *cert. denied,* 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 617 (1981); *Strobl v. New York Mercantile Exchange,* 582 F.Supp. 770, 774 (S.D. N.Y.1984), *aff'd,* 768 F.2d 22 (2d Cir.), *cert. denied,* 474 U.S. 1006, 106 S.Ct. 527, 88 L.Ed.2d 459 (1985).

16. PX H–29· at 902 (Fustok deposition).

and Bunker Hunt. As to the third, Fustok emphasizes that he never agreed to participate in the plan to issue bonds and never signed the agreement to share losses. He argues that the later meetings only suggest Hunt's and Nahas' desperate need for financial assistance and that the alleged agreement reflects only the intent of other alleged conspirators to cheat him.

The meetings, however, viewed collectively, permit a reasonable inference that Fustok was a participant in the conspiracy. During these meetings, it is undisputed that he and other conspirators discussed their silver purchases, the shortage of silver, and, at the later meeting, even the effect their collective acts could have on the market price.

Finally, evidence that Fustok's acts were inconsistent with his economic self-interest but were consistent with the conspiracy permits a reasonable inference that he was not acting independently. First, the percentage of Fustok's investments which were in metals, only a fraction of which were not silver, rose dramatically during the period of the alleged conspiracy, increasing from 1.06% of the portfolio in June 1979 to over 90% in February 1980. Investing his entire wealth in the silver market could be regarded as courting a great risk unless the investor had some knowledge or belief that the price would rise. The investment was also contrary to Fustok's stated goal of diversifying his portfolio. Second, it cost Fustok hundreds of thousands of dollars to ship physical silver out of the United States to Switzerland. Minpeco maintains that Fustok could have avoided these expenses had he arranged for Comex warehouses to swap receipts with warehouses in Europe, a fact disputed by Fustok who argues that he would have had to pay more for the silver in the European market. Fustok's willingness to incur the expense, according to Minpeco, was consistent with the conspiracy since Fustok was allegedly trying to raise the price of silver by reducing the stock of Comex silver.

Fustok maintains that his acts were economically inconsistent with the conspiracy, arguing that he could not benefit from the alleged squeeze of traders who had short silver positions, because he had physical silver, stored in Europe, rather than long futures contracts. There seems, however, to be no reason why Fustok could not have exacted a premium from shorts for sale of his silver, despite its location.

In sum, considering the evidence of parallel conduct together with the "plus factors" discussed above, including Fustok's dramatic change in trading behavior, his high level of communication with other conspirators, and the conflict between some of his trading activity and his economic self-interest, a jury could reasonably infer that Fustok, despite his sworn denial to the contrary, had participated in the conspiracy.

### B. *Lamar Hunt*

Lamar Hunt, youngest brother of Bunker and Herbert Hunt, denies any role in the conspiracy and argues that he engaged in few forms of the conduct attributed to the alleged conspirators, that his conduct is not consistent with the conspiracy, and that he is alleged to be a conspirator solely because he is the brother of two alleged conspirators. While evidence of Lamar Hunt's allegedly conspiratorial conduct is limited primarily to his development of large silver positions during 1979–80, often in more distant months than other conspirators, Minpeco has produced sufficient evidence from which a reasonable juror could conclude that he participated in the conspiracy.

Hunt emphasizes that his trading was not concentrated in the so-called "target months" of the conspiracy, but instead in June, July, September 1980 and March 1981 positions. However, Hunt did trade in congested, target months and his positions in later months are consistent with the conspiracy alleged by Minpeco. Under Minpeco's theory, large positions in later months were necessary for the alleged conspirators to extend their domination over the Comex warehouse supplies and to prevent the price of silver from dropping as it would if their positions suddenly fell off.

Minpeco has introduced evidence of four types of conduct by Hunt which allegedly parallels the conduct of other defendants: 1) Hunt traded in the target months of September 1979, December 1979, and March 1980 contracts; 2) he had substantial positions in June 1980, July 1980, and September 1980, positions which increased substantially in fall 1979 and early 1980; 3) he increased his September 1980 contracts at a time when Comex limits required Herbert and Bunker Hunt to reduce their positions; 4) by the end of 1979, he was trading at three brokerage houses in which his brothers had accounts, although he had done all of his trading at one brokerage house for the five previous years.

Hunt argues that he increased his silver positions at the end of 1979 and in early 1980 thinking silver to be a wise investment, that many of his contracts were for the distant date of March 1981, that he did not purchase as many September 1980 contracts as his limit allowed, and that he began trading at several brokerage houses in order to procure advice from different sources.

The evidence on these points may be as consistent with independent as conspiratorial conduct. Nevertheless, other plus factors tip the balance.

First, the evidence of record indicates Lamar Hunt's high level of communication with other conspirators. Hunt and his brothers shared information about the silver market. It is undisputed that Lamar began trading in silver on the advice of his brothers, who discussed with him many articles about the silver market over a period of years, including articles about the Comex investigations and Comex rule changes.

The brothers did more than communicate; they also facilitated one another's actions. Herbert Hunt placed the order for Lamar Hunt's 1000 contract straddle, although, according to Lamar, he (Lamar) decided the size and position of the straddle and his brother placed the call primarily because Lamar had never previously ordered a straddle. The brothers also loaned money to each other to finance their silver margin calls.

Finally, Minpeco's evidence that Lamar Hunt engaged in transactions contrary to his self-interest tends to exclude the possibility that he was acting independently.

First, Lamar Hunt sustained large losses in silver transactions. For example, on November 15, 1979, Lamar Hunt lost $1.6 million while liquidating December 1979 and March 1980 contracts and rolling them into September 1980.[17] Minpeco maintains that Hunt was willing to incur this loss in order to increase congestion in the September 1980 position, as other alleged conspirators later began to do. Hunt's explanation that he executed this transaction so that the September contracts would be subject to long-term capital gains treatment when they expired is plausible, but not compelling. A reasonable juror could find the explanation insufficient. Hunt has not produced documents relating to the tax treatment of his silver transactions and the affidavit of Sidney Meyer, Hunt's tax expert, does not purport to determine the specific tax consequences of Hunt's transactions although it does support the plausibility of the general purposes of Lamar's explanations.

Second, in December 1979 Lamar Hunt, contrary to his previous investment pattern, rolled his positions forward into distant months, purportedly to secure long-term gain tax treatment on the transactions. However, one week later he acquired positions in congested months that would be subject to short-term capital gain taxes. Although Hunt's explanation that he made the latter purchases because his straddle[18] could cover additional short-term gains is plausible, it is subject to a conflicting, reasonable interpretation that his participation in the conspiracy explains this seemingly inconsistent conduct.

---

17. PX H–44 at 208–210 (Lamar Hunt deposition).

18. The parties' experts also dispute whether the straddle itself was economical. *Compare* PX G–2 (Affidavit of Hendrik Houthakker) *with* Reply Affidavit of Jeffrey Williams.

Third, late in December 1979, when Hunt closed out 130 contracts in the short legs of his 1,000 contract straddle,[19] he did not close enough of the short legs to cover the profit he had made. He claims that the additional profits were covered by a charitable gift.

Fourth, there is a genuine dispute whether the switches in which Lamar Hunt engaged in December and January were economical. The dispute is significant since Minpeco argues that Hunt engaged in the switches to further congest the March 1980 position and to create an impression of broad investor demand.

Fifth, Lamar Hunt shared losses with his brothers, by signing a promissory note to be jointly and severally liable for a loan made largely to his brothers and by allowing his brothers to use his assets to satisfy one of their obligations. On the other hand, Hunt has stated that he has only repaid that portion of the debt used to finance his margin calls and that his loan to his brothers was offset by amounts he owed them.

In sum, although the evidence of parallel conduct and communication with other conspirators is not in itself overwhelming, when considered together with evidence that defendant's transactions were not always consistent with his economic self-interest,[20] it is sufficient to permit a reasonable juror to conclude that Lamar Hunt participated in the conspiracy.

\* \* \* \* \* \*

In sum, it is concluded that Minpeco has presented genuine issues for trial as to the participation by the five moving defendants in the alleged conspiracy. Defendants' motions for summary judgment on all conspiracy claims are denied.[21]

---

**19.** Lamar Hunt Exhibit H (Lamar Hunt silver futures positions chart).

**20.** The *Apex* court held that evidence of uneconomical behavior alone is insufficient to support an inference of participation in a conspiracy if that evidence is ambiguous. *Apex,* 822 F.2d at 254. Here, however, the evidence of uneconomical behavior is stronger than in *Apex.* In this case, unlike in *Apex,* the plaintiff has alleged more than one instance of acts contrary to the defendant's self-interest and the

allegations are supported in the record by plaintiff's expert or Hunt's statements.

**21.** This opinion does not address the issues raised by Merrill Lynch as to whether Minpeco's claims of aiding and abetting and attempted manipulation under the Commodity Exchange Act must be dismissed as a matter of law. These issues, to which Minpeco has not yet responded, will be decided at a later date.