### In re MEDICAL X–RAY FILM ANTITRUST LITIGATION.

No. CV–93–5904.

United States District Court, E.D. New York.

Sept. 27, 1996.

**210**

Robert Kaplan, Kaplan & Kilsheimer, Stanley Grossman, Richard Kilsheimer, New York City, for Plaintiff.

Jones, Day, Reavis & Pogue, New York City, by Thomas Demitrack, Cleveland, OH, for Fuji.

Sullivan & Cromwell, Richard H. Klapper, New York City, for Kodak.

Winthrop Stimson by Edwin J. Wesely, New York City, Donald L. Flexner, Washington, DC, for Dupont.

Pitney Hardin, Kipp & Szuch by Murray J. Laulicht, Florham Park, NJ, for Miles.

SIFTON, Chief Judge.

In these consolidated antitrust actions, plaintiffs allege that defendants Eastman Kodak Co., E.I. DuPont de Nemours & Co., Miles, Inc., and Fuji Medical Systems, U.S.A., Inc. have fixed the prices of medical x-ray and imaging films since 1988, in violation of the Sherman Antitrust Act ("the Sherman Act"), 15 U.S.C. § 1. Defendants have filed a renewed motion to dismiss the amended complaint, pursuant to Rules 8, 9, and 12[1] of the Federal Rules of Civil Procedure. For the reasons set forth below, the motion is converted into one for summary judgment and, as such, is denied.

## PROCEDURAL BACKGROUND

The instant motion involves five cases filed as separate but related actions, which have been consolidated for pretrial purposes.[2] All five cases seek damages on behalf of a class of purchasers of medical x-ray film.[3] The original complaints allege that defendants, along with other unnamed co-conspirators, conspired to fix, raise, maintain, and stabilize the prices of medical x-ray and imaging films, including general radiography films,

1. It is not clear from defendants' motion papers whether they are proceeding under Rule 12(b)(6) or 12(c). Since defendants have filed answers to the amended complaint, the Court treats the motion as having been brought pursuant to Rule 12(c). *See Ad–Hoc Comm. of Baruch Black & Hispanic Alumni Ass'n v. Bernard M. Baruch College*, 835 F.2d 980, 982 (2d Cir.1987); *see also* 5A C. Wright & A. Miller, Federal Practice and Procedure § 1367, at 514–17 (1990).

2. These cases are: *Victoria Orthopedic Assoc. v. Eastman Kodak Co.*, 93 CV 5904; *Nutri–Dyn Midwest Inc. v. Eastman Kodak Co.*, 93 CV 5940; *Imco, Ltd. v. Eastman Kodak Co.*, 93 CV 5941; *Westmoreland Professional Corp. v. Eastman Ko-*

*dak Co.*, 94 CV 889; and *Michael Cook v. Eastman Kodak Co.*, 94 CV 890.

3. The class in each complaint is defined as:

all person, firms, corporations and other entities in the United States (excluding (a) federal, state and local governmental entities and political subdivisions, and (b) defendants and co-conspirators, and other manufacturers of medical x-ray film, their respective parents, subsidiaries and affiliates) that purchased medical x-ray film directly from any defendant, or any parent, subsidiary or affiliate thereof, at any time during the period from January 1, 1989 to the present.

mammography films, radiation therapy films, CRT and video imaging films, laser imaging films, duplicating films, and spot films sold in the United States to plaintiffs and other class members at supra-competitive levels from 1988 to the present, in violation of Section 1 of the Sherman Antitrust Act. In furtherance of the conspiracy, defendants allegedly agreed to and did exchange current and future price information; agreed to and did coordinate pricing levels and movements; agreed upon prices and price levels; agreed to and did fix, stabilize, inflate and increase prices and price levels in relation to each other; and agreed to and did refrain from competing among themselves on the basis of price. Each complaint seeks declaratory, injunctive, and compensatory relief on behalf of the named plaintiffs and the class for injuries sustained as a result of the foregoing activities.

On February 23, 1994, defendants moved to dismiss the complaints under Fed.R.Civ.P. 8, 9(b), and 12(b)(6). At oral argument on April 6, 1994, the Court proposed that plaintiffs file an amended complaint with more particularized allegations that would not unduly bind plaintiffs, that defendants then file their answers within thirty days, and that automatic disclosure under the Civil Justice Expense and Delay Reduction Plan be expedited in order for the parties to depose four witnesses whose testimony plaintiffs claimed supports the allegations in the complaint. The parties consented to the Court's proposal, thereby disposing of the motion to dismiss.

Plaintiffs filed an amended complaint on April 14, 1994, alleging additionally that, in furtherance of the claimed conspiracy, defendants exchanged price increase announcements and other competitive information in advance of their release to the public; discussed future and prospective price increases during the course of trade association meetings; increased prices by approximately the same percentage amounts within a brief period of time of one another; and engaged in non-public meetings, telephone conversations, and facsimile message exchanges in which future and prospective price increases were disclosed or discussed. The parties thereafter deposed four witnesses, all of whom are former employees of defendants: Joel Popham of Kodak, Gregory Gessert of Fuji, and Ronald Bloomquist and John Farrell of Agfa Corporation ("Agfa"), which merged with Miles, leaving Agfa a division of Miles effective December 31, 1991. The deposition testimony is summarized below.

Defendants subsequently renewed their motion to dismiss under Fed.R.Civ.P. 8, 9, and 12, contending that the deposition testimony provides an insufficient factual basis upon which to state a claim under the antitrust laws. At oral argument on July 27, 1994, the Court attempted to clarify the procedural posture of the motion presented. While defendants considered the motion one for dismissal with the deposition testimony serving simply as an amplification and thus part of the pleadings, plaintiffs considered discussion of the deposition testimony as requiring that the motion be converted to one for summary judgment. After listening to argument from both sides, the Court granted a continuance of the motion in order to permit limited discovery and depositions of the supervisors identified by the four witnesses previously deposed, as well as circumscribed discovery of individuals mentioned in the subsequent depositions, by agreement of the parties. The parties were instructed to supplement their papers with any other materials obtained through discovery that would bear on a motion for summary judgment, and oral argument was set for October 6, 1994.

By order dated October 5, 1994, the Court adjourned the motion to any date to be set by the magistrate. At a conference on October 24, 1994, to resolve discovery disputes, Magistrate Judge Caden outlined the limited discovery to be pursued in conformity with the Court's direction of July 27, 1994.

On November 16, 1994, all five cases were randomly reassigned to Judge Block, during which time discovery continued, but the instant motion was never decided.

In February 1996, the case was reassigned from Judge Block to the undersigned, and a status conference was held on February 8, 1996. The parties were directed to brief the outstanding motion, which is currently before the Court.

## FACTUAL BACKGROUND

The following is a summary of the deposition testimony of the four employees originally deposed, upon which the complaint's allegations are based.

Joel Popham testified that he had been a sales representative for Kodak from October 1988 to May 1992. He stated that he had no personal knowledge of any employee of Kodak exchanging future price information prior to the public announcement of that information, no personal knowledge of any communication between an employee of Kodak and an employee of any other x-ray film manufacturer regarding pricing, and no personal knowledge of any agreement between or among any x-ray film manufacturers regarding pricing.

Popham did, however, testify that during a sales training meeting in November 1988 a group of Kodak employees began to whisper among themselves and then left the room. At the conclusion of the meeting, the instructor told the trainees that the other employees had left the room because they had been made aware that DuPont intended to announce a price increase and they needed to decide what kind of a response Kodak would make to that price increase. According to Popham, the price increase would have taken effect early in 1989. Popham further testified that he did not himself hear what the employees were whispering about, and he did not know how these employees were made aware that DuPont was going to increase its prices. In April 1989, he learned that DuPont had increased its 1989 list prices for medical x-ray film.

Popham also explained that Kodak had sales contracts with various hospitals but that the hospitals did not deal with Kodak directly. Rather, Kodak sold the medical x-ray film to its authorized dealers throughout the United States who, in turn, functioned as distributors selling the film to the hospitals. He said that Kodak's principal competitors were DuPont, Fuji, Agfa, 3M and Konica, and they all, as well as Kodak, issued price lists for medical x-ray film they sold. The prices increased annually during Popham's employment with Kodak. They generally were announced late in the year and were put in effect shortly after January 1 of the following year. Popham was unable to recall whether DuPont's price increases in 1990 were the same as Kodak's price increases for that year.

Popham also testified that in the fall of 1989, 1990 and 1991, his Kodak sales district supervisor, Don Waddelow, telephoned the sales representatives in his district, including Popham, and informed them each year that DuPont would be announcing a price increase. He instructed the sales representatives to talk to Kodak's customers and dealers to ascertain whether they had any information regarding this price increase. Popham testified that he was not instructed to communicate directly with a competitor, that he never did communicate with any competitors about price increases, and that his supervisor's requests did not lead him to believe that his supervisor had direct information from DuPont about a price increase.

Popham thereafter contacted those customers and dealers who bought film from both Kodak and DuPont in an effort to obtain the requested information. In 1990 and 1991, his customer inquiries were fruitless, and he did not obtain any information regarding potential price increases. In 1989, however, a Kodak authorized dealer who was also a DuPont authorized dealer told Popham that he had been apprised of a pending DuPont price increase of between five and seven percent for 1990. Popham testified that this information was not already available in the field, but he did not know how the customer had learned the information.

Popham testified that in 1989, DuPont announced its price increase before Kodak did, but in 1990 and 1991, Kodak announced its price increase before DuPont. He also explained that Kodak film dealers usually were informed of Kodak's price increases approximately thirty days before the price increase would become effective so that the dealers could buy an extra month's-worth of film at the old prices prior to the price increase. Although Popham and other sales representatives would have been made aware of the impending price increases before the dealers were, he testified that he did not disclose

those increases to anyone, nor was he aware that any other sales representative had.

John Farrell testified that he was employed by Agfa from March 15, 1989, until he was fired in July 1992, as a territory manager for the western half of Missouri, Kansas, Nebraska, and a portion of Iowa. He was responsible for promoting sales of Agfa products, including medical x-ray film, through a dealer network as well as through direct sales to hospitals. Farrell identified Kodak, DuPont, and Fuji as Agfa's major competitors in the sale of medical x-ray film at that time.

Farrell testified that there was a general industry-wide price increase in medical x-ray film in January and February of 1990, 1991, and 1992 in which DuPont, Kodak, Fuji, and Agfa participated. According to Farrell, the price increases between the companies were very close in time and amount. He stated that he obtained advance notice in late October or early November prior to the increase of each of the three years that there would be general price increases in medical x-ray film by Kodak, DuPont, Fuji, and Agfa. He received the information through either telephone calls or by letter from Bob Eisen, his regional manager, who instructed Farrell to find out from his dealers or hospital contacts the details of the industry-wide price increase. Farrell then spoke with several dealers and hospitals who told him they had not been notified by any of the other companies concerning any type of price increase.

Farrell also testified that Mr. Eisen mailed to him written competitor information, including internal memoranda authored by Agfa's competitors and information on terms and conditions of sale offered by Agfa's competitors, such as DuPont, Fuji, and 3M, on more than one occasion during his employment with Agfa. Farrell was unaware of how Eisen obtained these documents. Farrell testified further that Eisen mentioned to him on several different occasions that he had contact with Agfa's competitors, such as Kodak, but Farrell could provide no details concerning these contacts or the specific subjects discussed.

Farrell testified that he had no knowledge of any meetings among competitors regarding prices, that he had never attended any such meetings with competitors nor did he have any knowledge of others having done so, and that he was not aware of any exchanges of future price information.

Gregory Gessert testified that he was employed by Fuji from July 1990 until he was discharged in June 1992, as a sales representative in Montana for Fuji's x-ray film division. He identified Fuji's competitors in the medical x-ray film industry as Kodak, DuPont, 3M, Konica, and Agfa. Gessert recalled that Fuji increased its list prices for medical x-ray film in January 1991 and January 1992. He was instructed generally to collect competitive information, including pricing, and to report what he obtained on a competitive information form.

Gessert testified further that he met with Ronald Bloomquist, a sales representative for Agfa, in December[4] at a Christmas party held by the Wisconsin Society of Radiological Technicians (WSRT), a district of the American Association of Radiological Technicians, and they exchanged pricing information. Specifically, Gessert provided a copy of a draft of the proposed Fuji price increases for 1992, and Bloomquist provided a memo Gessert believes notified distributors and dealers of an approximate percentage increase in Agfa film prices. Gessert faxed the draft he received to Tim Smalley, his supervisor, in Michigan.

Ronald Bloomquist testified that he was employed by Agfa from June 1989 until he was involuntarily terminated in November 1992, as a territory sales manager responsible for selling film and equipment to clinics in Wisconsin and parts of Northern Illinois. His supervisors were Robert Eisen and James Prelaske. He identified Kodak, DuPont, Fuji, and Konica as Agfa's competitors in the sale of x-ray film in the United States. He stated that in October 1989, 1990, and 1991, he was told by Eisen and Prelaske of a forthcoming price increase of five or six percent by either Kodak or DuPont, before it was formally announced, to be effective in

---

4. The deposition does not specify the year in which this meeting took place.

January and February of each following year and that he should find out what he could about the competition.

Bloomquist testified that he attended Christmas parties in December 1989 and on December 13, 1990, held by WSRT, during which time he met with Gessert. On both occasions, the two discussed the industry price increase in medical x-ray film and the fact that each of their employers was announcing a price increase. Bloomquist specifically remembered that Gessert told him at the December 1990 meeting of Fuji's future price increase. In addition, during the 1990 meeting, Gessert provided Bloomquist with a Fuji internal memorandum addressed to Fuji's sales representatives preannouncing a future price percentage increase by Fuji.[5] Bloomquist was reluctant to provide Gessert with any documentation, but verbally relayed that Agfa was following the same direction as Fuji and contemplated a six-percent price increase. Bloomquist then telephoned Eisen with the information he had received from Gessert.

## DISCUSSION

■ Defendants argue that the complaint should be dismissed pursuant to Rules 8, 9 and 12 of the Federal Rules of Civil Procedure. As an initial matter, the Court must determine whether to treat the instant motion as one to dismiss the complaint or as a motion for summary judgment in light of the discovery that has been had thus far in the case and the information outside of the pleadings that informs the motion at hand. Rule 12(c), provides that

[i]f, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as

5. Bloomquist believes that Gessert showed him this document but did not give it to him.

6. Rule 12(b) provides that if, on a motion to dismiss for failure to state a claim upon which relief can be granted,

provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

This language, identical to that contained in Rule 12(b),[6] has been deemed mandatory, requiring a district court to convert a motion for dismissal into a motion for summary judgment the instant materials external to the pleadings are considered. *See Carter v. Stanton,* 405 U.S. 669, 671, 92 S.Ct. 1232, 1234, 31 L.Ed.2d 569 (1972); *see also American Fed'n of State, County & Mun. Employees, AFL–CIO v. Nassau County,* 609 F.Supp. 695, 700 (E.D.N.Y.1985).

As defendants point out, the Second Circuit has recognized that when a plaintiff "has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12 ... motion into one under Rule 56 is largely dissipated." *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992). While the Court considered treating the initial four depositions as integral to the complaint for the purposes of the renewed motion to dismiss, the Court, heeding defense counsel's suggestion, made clear on July 27, 1994, when it granted additional discovery, albeit circumscribed, that the continued motion would be converted to one for summary judgment. *Cf. Capital Imaging Assoc., P.C. v. Mohawk Valley Medical Assoc., Inc.,* 996 F.2d 537, 539 (2d Cir.) (summary judgment motion considered after limited discovery permitted), *cert. denied,* 510 U.S. 947, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993). Moreover, even if evidence from the original four employee depositions was considered part of the pleadings, the additional discovery the Court permitted cannot be said to form the basis for the complaint since plaintiffs did not have access to the additionally discovered documents or witnesses before the complaint was filed.

matters outside the pleadings are presented and not excluded by the court, the motion shall be treated as one for summary judgment ... and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Federal Rule of Civil Procedure 56(c) provides that summary judgment must be granted if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law. The moving party has the burden of demonstrating the absence of any disputed material facts, and the court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. *See Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir.1990).

The showing needed on summary judgment reflects the burden of proof in the underlying action. The court must consider "the actual quantum and quality of proof" demanded by the underlying cause of action and which party must present such proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Therefore, when the ultimate burden of proof is on the nonmoving party, the moving party meets his initial burden for summary judgment by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). To survive the motion, the nonmoving party must then "make a showing sufficient to establish the existence of [the challenged] element essential to [that party's] case." *Id.* at 322, 106 S.Ct. at 2552. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. at 2510. Thus, summary judgment is appropriate "[w]hen the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■ Defendants argue that plaintiffs have failed to state a legally cognizable claim for violation of the antitrust laws, thereby entitling defendants to judgment as a matter of law. Section 1 of the Sherman Act makes "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, . . . illegal." 15 U.S.C. § 1. In order to establish a claim under Section 1, a plaintiff must be able to show: (1) concerted action, (2) by two or more persons, (3) which unreasonably restrains interstate or foreign trade or commerce. *See Oreck Corp. v. Whirlpool Corp.*, 639 F.2d 75, 78 (2d Cir.1980), *cert. denied*, 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1981); *In re Nasdaq Market–Makers Antitrust Litig.*, 894 F.Supp. 703, 710 (S.D.N.Y. 1995); *Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 687 F.Supp. 832, 837 (S.D.N.Y. 1988). Such concerted action or agreement unreasonably restrains trade if (1) a specific intent to create an unreasonable restraint of trade is found or (2) the restraint constitutes a *per se* violation of the statute. *See Times–Picayune Publishing Co. v. United States*, 345 U.S. 594, 614, 73 S.Ct. 872, 883, 97 L.Ed. 1277 (1953) (quoting *United States v. Columbia Steel Co.*, 334 U.S. 495, 522, 68 S.Ct. 1107, 1121–22, 92 L.Ed. 1533 (1948)). Horizontal price fixing,[7] as alleged in the complaint, has been considered a *per se* violation of the statute. *See Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647, 100 S.Ct. 1925, 1927–28, 64 L.Ed.2d 580 (1980); *United States v. Container Corp. of Am.*, 393 U.S. 333, 337, 89 S.Ct. 510, 512, 21 L.Ed.2d 526 (1969) ("interference with the setting of price by free market forces is unlawful *per se* ") (citing *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 224 n. 59, 60 S.Ct. 811, 846 n. 59, 84 L.Ed. 1129 (1940)).

■ The specific elements necessary to prove a claim of horizontal price fixing, as set forth by the Supreme Court, are: (1) the existence of an agreement, combination or conspiracy, (2) among actual competitors, (3) with the purpose or effect of "raising, depressing, fixing, pegging, or stabilizing the price of a commodity," (4) in interstate or

---

7. Horizontal price fixing involves price-setting agreements entered into by competitors at the same level of the market structure, while vertical price fixing consists of pricing agreements between firms at different levels of the market structure, such as manufacturers and distributors. *See K.M.B. Warehouse Distrib., Inc. v. Walker Mfg. Co.*, No. 92 Civ. 1167, 1994 WL 250115 at *6 n. 3 (S.D.N.Y. June 1, 1994), *aff'd*, 61 F.3d 123 (2d Cir.1995).

foreign commerce. *United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 223–24, 60 S.Ct. 811, 844–46, 84 L.Ed. 1129 (1940).

▮▮ Defendants argue that plaintiffs have not presented a legally sufficient basis upon which to find the first element of a price fixing scheme, namely, a conspiracy or agreement. To establish this element, the evidence must show "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984); *see also Minpeco, S.A. v. Conticommodity Serv., Inc.,* 673 F.Supp. 684, 688 (S.D.N.Y.1987). In order to survive a motion for summary judgment, a plaintiff must produce direct or circumstantial evidence "that tends to exclude the possibility" that defendants acted independently of each other. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 597–98, 106 S.Ct. 1348, 1362, 89 L.Ed.2d 538 (1986) (citing *Monsanto Co.,* 465 U.S. at 764, 104 S.Ct. at 1470); *see also Capital Imaging,* 996 F.2d at 545 ("to withstand defendants' summary judgment motion[, plaintiffs] must present evidence that casts doubt on inferences of independent (not combined) action or proper conduct by defendants.") (citing *Matsushita,* 475 U.S. at 588, 106 S.Ct. at 1356–57). The Supreme Court has further elaborated on this statement by noting that "conduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. at 597 n. 21, 106 S.Ct. at 1361 n. 21 (1986).

▮▮ The Supreme Court has, of course, recognized that a conspiracy or agreement to restrain trade in violation of the Sherman Act need not be express but can be inferred from the circumstances:

> It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators. Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint on interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act.

*Interstate Circuit v. United States,* 306 U.S. 208, 227, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939) (citations omitted); *see also Oreck Corp. v. Whirlpool Corp.,* 639 F.2d at 79 ("It is not necessary that such a combination be established by direct proof of oral or written agreements; it may be proven by inferences drawn from circumstantial evidence, including the acts an conduct of the alleged conspirators.") (citations omitted).

The Supreme Court has cautioned, however, that, while "[o]n summary judgment the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion," *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356 (quoting *United States v. Diebold, Inc.,* 369 U.S., 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)), "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Id.* at 588, 106 S.Ct. at 1356; *see also Minpeco, S.A.,* 673 F.Supp. at 688. Accordingly, plaintiffs must be able to show that "the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondents." *Id.* (citation omitted); *see also Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1962) (holding that conduct equally consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy). The Supreme Court subsequently noted that it did not mean—

> that if the moving party enunciates *any* economic theory supporting its behavior, regardless of its accuracy in reflecting the actual market, it is entitled to summary judgment. *Matsushita* demands only that the nonmoving party's inferences be reasonable in order to reach the jury, a requirement that was not invented, but merely articulated, in that decision.

*Eastman Kodak Co. v. Image Technical Serv., Inc.,* 504 U.S. 451, 468, 112 S.Ct. 2072, 2083, 119 L.Ed.2d 265 (1992) (footnote omitted).

One of the more common forms of circumstantial evidence proffered to support a price fixing agreement or conspiracy is proof of parallel pricing between competitors, also known as conscious parallelism or oligopolistic price coordination. Conscious parallelism has been described as

the process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions.

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 226–28, 113 S.Ct. 2578, 2590, 125 L.Ed.2d 168 (1993) (citations omitted).

Here, plaintiffs have asserted the existence of parallel pricing. They point to deposition testimony in which former and present employees of defendants' companies have stated that, every time there was a price increase between 1989 and 1993, the list prices for medical x-ray film among defendants were very close in amount and that the timing of the price increases was also close, often on the same day each year. According to plaintiffs, this testimony also reveals that defendants' price increases impacted actual pricing in the marketplace.

Defendants, without denying plaintiffs' description of the effect, size, and timing of the price increases, argue that proof of such parallel behavior is not sufficient by itself to establish an agreement or conspiracy. They note that the Supreme Court has stated:

To be sure business behavior is admissible circumstantial evidence from which the fact finder may infer agreement. But this Court has never held that proof of parallel business behavior conclusively establishes agreement or, phrased differently, that such behavior itself constitutes a Sherman Act offense. Circumstantial evidence of consciously parallel behavior may have made heavy inroads into the traditional judicial attitude toward conspiracy; but "conscious parallelism" has not yet read conspiracy out of the Sherman Act entirely.

*Theatre Enter., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540–41, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954) (citations omitted); *see also United States v. International Harvester Co.*, 274 U.S. 693, 708–09, 47 S.Ct. 748, 753–54, 71 L.Ed. 1302 (1927) ("[T]he fact that competitors may decide, in the exercise of their own judgment, to follow the prices of another manufacturer, does not establish any suppression of competition or show any sinister domination.") (citation omitted); *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir.) ("[p]arallel conduct can be probative evidence bearing on the issue of whether there is an antitrust conspiracy. However, parallel conduct alone will not suffice as evidence of such a conspiracy even if the defendants 'knew the other defendant companies were doing likewise.' More must be shown.") (citation omitted), *cert. denied*, 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987); *E.I. DuPont de Nemours & Co. v. F.T.C.*, 729 F.2d 128 139 (2d Cir.1984) ("The mere existence of an oligopolistic market structure in which a small group of manufacturers engage in consciously parallel pricing of an identical product does not violate the antitrust laws. ... [P]rice uniformity is normal in a market with few sellers and homogeneous products.") (citing *Theatre Enter. v. Paramount Film Dist. Corp.*, 346 U.S. at 539–41, 74 S.Ct. at 259).

More recently, the Supreme Court has recognized with regard to predatory pricing, which may be orchestrated similarly to parallel pricing, that "this anticompetitive minuet is most difficult to compose and to perform, even for a disciplined oligopoly." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. at 228, 113 S.Ct. at 2590. At the same time, the Court acknowledged that

however unlikely th[e] possibility [of such a scheme's success] may be as a general matter, when the realities of the market and the record facts indicate that it has occurred and was likely to have succeeded, theory will not stand in the way of liability.

*Id.* at 229, 113 S.Ct. at 2591 (citation omitted).

■ Accordingly, an agreement may be proven, even absent proof that it was made express, when, in addition to proof of parallel

pricing, there are present additional "plus factors" from which such an inference properly could be made. *See Interstate Circuit v. United States,* 306 U.S. 208, 222–23, 59 S.Ct. 467, 472–73, 83 L.Ed. 610 (1939). These plus factors include: (1) evidence of conduct that is contrary to the defendants' independent self-interest; (2) the presence or absence of a strong motive to enter into the alleged conspiracy; (3) the artificial standardization of products; and (4) a high level of interfirm communications. *See Apex Oil Co. v. DiMauro,* 822 F.2d at 254; *E.I. DuPont de Nemours,* 729 F.2d at 139 n. 10 (citations omitted). Thus, although evidence of parallel conduct between competitors alone is insufficient to prove an agreement or conspiracy, an agreement may properly be inferred from conscious parallelism when these "plus factors" are present.

Here, plaintiffs claim that in addition to parallel pricing there is evidence of a number of "plus factors," including the exchange of future price increase information, advance notice of future price increases, dissemination of current price information, and contacts and communications between defendants.

Defendants note in response that the "mere opportunity to conspire does not by itself support the inference that an illegal combination actually occurred." *Capital Imaging Assoc., P.C. v. Mohawk Valley Med. Assoc., Inc.,* 996 F.2d at 545; *see also Oreck Corp. v. Whirlpool Corp.,* 639 F.2d at 79. They also argue something different by noting that each of the "plus factors" considered independently, such as the dissemination or gathering of price-related information, does not constitute a violation of the Sherman Act. *See United States v. Citizens & S. Nat. Bank,* 422 U.S. 86, 113, 95 S.Ct. 2099, 2114–15, 45 L.Ed.2d 41 (1975) ("[T]he dissemination of price information is not itself a *per se* violation of the Sherman Act."); *see also Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643, 647, 100 S.Ct. 1925, 1927–28, 64 L.Ed.2d 580 (1980) ("[A]dvance price announcements are perfectly lawful."); *Greenhaw v. Lubbock County Beverage Ass'n,* 721 F.2d 1019, 1030 (5th Cir.1983) ("[A] violation of the Sherman Act is not necessarily established by an ex-

change of price information. Further evidence of an actual fixing effect on prices must be adduced before an antitrust violation is established.") (citation omitted); *Vermont Int'l Petroleum Co. v. Amerada Hess Corp.,* 492 F.Supp. 429, 434 (N.D.N.Y.1980) ("price verification is not, of course, *per se* unlawful") (citing *United States v. United States Gypsum Co.,* 438 U.S. 422, 453–59, 98 S.Ct. 2864, 2881–85, 57 L.Ed.2d 854 (1978)). So too, the mere possession of a competitor's price-related documents, even with evidence of parallel pricing, has been held not to give rise to an inference of a price-fixing agreement. *See Stephen Jay Photo., Ltd. v. Olan Mills, Inc.,* 903 F.2d 988, 996 (4th Cir.1990) ("The fact that the price information about one company is found in a competitor's files or an employee reports a competitor's pricing policy to his home office and the two companies charge similar prices for their products, without more, cannot support an inference [of conspiracy]."); *see also F.T.C. v. Lukens Steel Co.,* 454 F.Supp. 1182, 1193 (D.D.C. 1978).

Defendants, however, have failed to take into account that "[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962) (citations omitted); *see also id.* at 707, 82 S.Ct. at 1414–15 ("[A]cts which are themselves legal lose that character when they become constituent elements of an unlawful scheme.") (citations omitted). Similarly, "[s]eemingly innocent or ambiguous behavior can give rise to a reasonable inference of conspiracy in light of the background in which the behavior takes place." *Minpeco, S.A.,* 673 F.Supp. at 688 (quoting *Apex Oil Co.,* 822 F.2d at 254–55). Thus, while each of these factors taken in isolation does not necessarily provide a basis alone for inferring an agreement or conspiracy, in combination, these factors, taken together and "on the ground," may support a reasonable inference that an agreement or conspiracy existed.

Turning to the evidence presented, plaintiffs first point to the meeting between Ges-

sert and Bloomquist on December 13, 1990, as proof that defendants have exchanged future pricing information. Gessert provided Bloomquist with a Fuji memorandum, which, plaintiffs assert, was not addressed to any Fuji customer and not yet announced to the trade, and which set forth Fuji's upcoming percentage price increase for 1991. Bloomquist relayed this memorandum to his supervisor. Plaintiffs contend that, although Fuji had announced a price increase three days earlier, on December 10, 1990, that announcement stated only that prices would increase "commensurate with industry trends," without setting forth the actual percentage increase contained in the exchanged memorandum. The percentage increase was not announced publicly until December 26, 1990.

At the same meeting, plaintiffs note, Bloomquist gave Gessert a draft internal Agfa memorandum indicating that Agfa would announce a price increase of approximately six percent, which Gessert faxed to Timothy Smalley, Fuji's regional sales manager. Agfa did not publicly announce its price increases until January 14, 1991.

Defendants argue that the "chance encounter" between Gessert and Bloomquist provides no basis from which to infer the existence of a conspiracy since the meeting was not prearranged, and the Fuji price increase announcement provided to Agfa had been distributed to customers three days earlier. Moreover, defendants point out that neither Bloomquist nor Gessert had any authority to set prices for their companies' x-ray film products. Furthermore, defendants contend that, prior to the exchange between Gessert and Bloomquist, all defendants had already decided on their respective price increases for the year, and three of them had made related announcements to the trade. In addition, defendants dispute plaintiffs' assertion that the Fuji memorandum in question was an internal document.

Plaintiffs also provide the affidavit of Kenneth Housemen, who worked as a sales representative for Agfa from 1985 to 1988, in northern Illinois, parts of Wisconsin, and Iowa. In his affidavit, Houseman states that he met with Robert Frits, a DuPont sales representative, and the two exchanged information prior to any public announcement regarding the percentage price increases their companies intended to implement in 1987. Similarly, Houseman states that he met with Martin DiFusco, a Kodak sales representative, and exchanged 1987 future pricing information, including proposed percentage increases, for their respective companies prior to any public announcement of the 1987 Kodak price increase. Defendants discount this affidavit, arguing that the discussions involved previously-decided pricing information, that Houseman never stated that he relayed the information he received to his superiors, and that the contacts were random, unplanned encounters during a period of competitive behavior between defendants.

As additional circumstantial evidence supporting the existence of a conspiracy or agreement, plaintiffs offer proof that defendants had advance notice of each other's future price increases. Plaintiffs point to the fact that Robert Eisen, a regional sales manager for Agfa who notified sales representatives working below him of future competitor price increases, typically received information from Agfa's headquarters regarding competitor price increases which had not yet been announced prior to his attending a trade show in Chicago that normally occurred in November of each year. In October 1989 in particular, Eisen was told prior to any announcement by DuPont that DuPont would lead the 1990 price increase, which it did.

In addition, as noted above, both Joyce Sudak and Joel Popham, former Kodak employees, testified that during a Kodak training presentation in November 1988 several employees left the room, allegedly to discuss information they had just received regarding DuPont's intention to announce a price increase in early 1989. Moreover, plaintiffs cite a number of instances in which various supervisors employed by defendants instructed their sales representatives to find out from dealers and customers about price increases that the supervisors had become aware of before these increases had been announced publicly.

Defendants argue that a price-fixing agreement cannot be inferred from the requests of defendants' supervisors that sales representatives attempt to gather information regarding proposed competitor price increases since those sales representatives deposed testified that they did not have any basis for believing that their supervisors had direct information from competitors regarding a price increase and because it is implausible that defendants would have secretly met and agreed to fix prices but have left it up to their sales people to discover in the market what the agreed upon prices were. Defendants, on the other hand, argue that the supervisors' requests that information be ferreted from the marketplace more persuasively demonstrate that these supervisors were engaging in legitimate, independent, competitive conduct to try to find information regarding competitor price activity during the months of the year each manufacturer historically announced price changes.

A third "plus factor" plaintiffs proffer to support the inference of a conspiracy or agreement is the dissemination among defendants of current price information detailing the terms and conditions of medical x-ray film sales to their customers, which plaintiffs argue, were not obtained from the customers themselves since they contain information not meant to be disseminated externally. At the very least, plaintiffs contend, there is a genuine issue of material fact as to how and why one defendant had access to another's internal marketing and pricing documents.

Defendants argue that a price-fixing agreement cannot be inferred from employees' possession of their competitors' price-related documents since the documents in question reflect pricing decisions previously announced to dealers and customers rather than prospective pricing information, and there was no evidence presented regarding where the possessors obtained the information regarding their competitors. Defendants also assert that all of the witnesses asked about these documents testified that they did not receive any of them directly from a competitor and that such documents typically came from customers. Defendants emphasize that five of the supervisors deposed testified that sales representatives frequently and with ease obtained competitor pricing information from their customers.

Finally, plaintiffs argue that evidence of direct contacts between defendants and the existence of multiple opportunities to conspire support the inference of a conspiracy or agreement to fix prices. Defendants discount these direct communications, arguing that none related to specific or future x-ray film price increases. However, as plaintiffs point out, these contacts demonstrate the ability and actuality of flowing communications between defendants and among their employees. Moreover, plaintiffs argue that defendants had an opportunity to conspire since Kodak, DuPont, Agfa, and Fuji attended meetings of the Radiological Society of North America, the American College of Radiology, and American Healthcare Radiology Administrators.

With regard to all of these "plus factors," the parties disagree over the interpretation and significance of the evidence presented to support each inference. Recognizing that it is not the Court's role on a motion for summary judgment to weigh the evidence presented, *see Apex Oil Co. v. DiMauro,* 822 F.2d at 252 ("[W]hile some assessing of the evidence is necessary in order to determine rationally what inferences are reasonable and therefore permissible, it is evident that the question of what weight should be assigned to competing permissible inferences remains within the province of the factfinder at trial.") (citations omitted), plaintiffs have presented a basis upon which the existence of a price-fixing agreement or conspiracy among defendants can reasonably be inferred. Despite the plausibility of defendants' innocent explanations for the circumstantial evidence plaintiffs have presented when considered piece by piece, this evidence when taken in combination tends to exclude the possibility that defendants acted independently in setting their prices for medical x-ray film each year. *Cf. Minpeco, S.A. v. ContiCommodity Serv., Inc.,* 673 F.Supp. 684, 688 (S.D.N.Y.1987) (denying motion for summary judgment when plaintiff was able to produce evidence of parallel conduct, a high level of communica-

tions, and a common motive among defendants to conspire to raise prices). Directly analogous is the case of *Vermont Int'l Petroleum Co. v. Amerada Hess Corp.*, 492 F.Supp. 429 (N.D.N.Y.1980). In that case, the district court found the Society of Independent Gasoline Marketers of America ("SIGMA"), an industry organization comprised of independent gasoline marketers, to be "a clearinghouse for the exchange of retail price information among independent gasoline marketers." *Id.* at 434. The court based its finding on the fact that information "was conveyed through telephone calls between SIGMA employees and those of the independents concerning posted retail prices, as well as planned price changes. In essence, SIGMA was the agent of the participating independents." *Id.* In much the same way, there is sufficient evidence in this case to infer that the market of medical x-ray film dealers and customers, in conjunction with the ease of interfirm communications, served as a kind of clearinghouse from which competitors could gather information regarding current prices and impending price increases in order to coordinate their pricing activities. As the court in the *Vermont Int'l Petroleum Co.* case emphasized, evidence of price verification must be scrutinized carefully, "since it carries the potential for price-fixing agreements." *Id.* Accordingly, the Court finds there to be a reasonable basis from which to infer an agreement or conspiracy sufficient to preclude granting summary judgment, and thus, for the reasons set forth above, defendants' motion is denied.[8]

SO ORDERED.

---

8. Because the Court has denied defendant's motion, the Court need not consider the sufficiency of plaintiffs' affidavit filed pursuant to Fed. R.Civ.P. 56(f). Moreover, because Rule 12(c) provides that all parties be given a reasonable opportunity to present materials relevant to a motion that has been converted to one for summary judgment, plaintiff's cross-motion to strike defendant's Local 3(g) statement for failing to comply with the Local Rules is denied.